James Troy McMURRY, et al.

v.

C. Paul PHELPS, et al.

Civ. A. No. 77–1289.

United States District Court,
W. D. Louisiana,
Monroe Division.

Jan. 7, 1982.

David Duhon, Mary Louise Strong, North Louisiana Legal Assistance Corp., Monroe, La., R. James Kellogg, New Orleans, La., for plaintiffs.

V. Gerald Dean, Grant, Scott & Dean, Monroe, La., for defendant, Bailey Grant, Sheriff.

Ben R. Hanchey, Hudson, Potts & Bernstein, Monroe, La., for defendant, Ouachita Parish Police Jury.

J. Marvin Montgomery, Asst. Atty. Gen., State of Louisiana, Baton Rouge, La., for State defendants.

OPINION

STAGG, District Judge.

This suit, brought as a class action[1] by inmates of the Ouachita Parish Jail, challenges conditions of confinement at the Parish Jail located on the top floor of the Ouachita Parish Courthouse. The suit was filed seeking declaratory and injunctive relief pursuant to 42 U.S.C., § 1983[2] for alleged deprivations of the rights of inmates secured under the First, Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, as well as certain statutory rights conferred by Louisiana law. The plaintiffs named as defendants various parish and state officials:

(1) C. PAUL PHELPS, as Secretary of the Department of Corrections for the State of Louisiana;

(2) DANIEL L. KELLY, as Fire Marshal for the State of Louisiana[3];

(3) DR. J. T. HAMERICK, as Director of the Louisiana State Division of Health[4];

(4) WILLIAM CHERRY, as Secretary of the Department of Health and Human Resources for the State of Louisiana[5];

(5) BAILEY GRANT, as Sheriff for the Parish of Ouachita[6]; and

(6) ARLAN E. RAWLS, BILLY BANKS, ROBERT C. DOWNING, A. E. PIERCE, III, WILLIE CRAIN, and BILLY F. WHILHITE, as members of the Ouachita Parish Police Jury.[7]

The plaintiffs challenged virtually every aspect of the operations and management of the Ouachita Parish Jail.

---

1. Finding that the putative class satisfied all four tests required in Rule 23(a) of the Federal Rules of Civil Procedure, the court certified the following class under Rule 23(b)(2):
 (1) All pretrial detainees presently and in the future held in the Ouachita Parish Jail.
 (2) All convicted prisoners presently and in the future held in the Ouachita Parish Jail.
 Memorandum Ruling of the Court filed July 17, 1978.

2. This statute was passed by Congress on April 20, 1871 and provides as follows:
 Every person who, under color of statute, ordinance, regulation, custom, or usage of any State or Territory, subjects or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in any action at law, suit in equity, or other proper proceeding for redress.

3. La.R.S. 40:1575 provides in part:
 Upon complaint of any person or upon his own initiative when he thinks necessary, the fire marshal or any of his authorized representatives may inspect any structure, watercraft or movable within the state except the interiors or private dwellings.
 * * * * * *
 Plaintiff's Exhibit 23 is a compilation of inspection reports performed pursuant to this statute. (Hereinafter all plaintiffs' exhibits shall be referred to as PX-_____.)

4. La.R.S. 15:751 provides:
 All jails, prisons, lockups and camps and all facilities, units and rooms of such jails, prisons, lockups and camps where prisoners are detained or confined *must meet standards of health and decency which shall be established by the state division of health.* The director of the Department of Corrections shall confer with the state health officer or his duly authorized representative concerning the establishment of such standards for all correctional institutions. The state health officer or his duly authorized representative shall periodically inspect all correctional institutions to determine if such institutions are in compliance with the established standards and he shall prepare and issue a report on his findings to the governor, the state hospital director and the administrators of the various institutions. (Emphasis supplied.)

5. Id.

6. La.R.S. 15:704 states:
 Each sheriff shall be the keeper of the public jail of his parish, and shall by all lawful means preserve the peace and apprehend all disturbers thereof, and other public offenders.

7. La.R.S. 15:702 governs the maintenance of parish jails:
 The governing authority of each parish shall be responsible for the physical maintenance of all parish jails and prisons. In those parishes in which the governing authority operates the parish jail the governing authority shall pass all bylaws and regulations they may deem expedient for the police and good government of the jails and prisons being operated by the parish governing authority.

After extensive discovery and tortuous negotiations, the parties hammered out a partial consent decree resolving some of the more troubling problems existing at the Ouachita Parish Jail (See Appendix A). The issues left for resolution concern conditions that plaintiffs contend are unconstitutional, either independently or as part of a total mix of conditions of confinement that fails to pass constitutional muster, and can be grouped under seven general headings: (1) Overcrowding; (2) Inadequate Supervision; (3) Visitation Rights; (4) Access to the Courts; (5) Censorship of Reading Material; (6) Sexual Discrimination; (7) Right to Sheets.

During discovery, the parties reached an impasse over the issue of paraprofessional staff visiting inmates at the jail. After a hearing, the court ruled that paralegals on plaintiffs' staff could interview inmates. This ruling was mandated by clear Supreme Court jurisprudence. *See Procunier v. Martinez*, 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974); *Johnson v. Avery* 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969). The remaining issues were tried before this court on May 15, 1979.

In adjudicating suits challenging the conditions of confinement at a parish prison, the district judge finds his course well charted by several Fifth Circuit precedents. *See e.g., Jones v. Diamond*, 636 F.2d 1364 (5th Cir. 1981) (*en banc*); *Miller v. Carson*, 563 F.2d 741 (5th Cir. 1977); *Gates v. Collier*, 501 F.2d 1291 (5th Cir. 1974). On most issues involved in this lawsuit, Judge Rubin's *en banc* opinion in *Jones v. Diamond* will provide the benchmark:

A prisoner, whether already convicted of a crime or merely awaiting trial, does not shed all his constitutional rights when he puts on jail clothing. While our "inquiry . . . into [state] prison management must be limited to the issue of whether a particular system violates any prohibition of the Constitution;" it is our duty, when jurisdiction is properly invoked, to protect prisoners' constitutional rights, for "[t]here is no iron curtain drawn between the Constitution and the prisoners of this country."[8]

*Jones v. Diamond* at 1368 (citations omitted.) But Judge Rubin also repeated the admonition that has been the common refrain of every recent Supreme Court case dealing with prisoners' rights: "[O]ur task is limited to enforcing constitutional standards rather than assuming supervision of jail administration." *Jones v. Diamond* at 1368.

Stated time and time again throughout the protracted proceedings and negotiations in this case, this judge has a distaste for crossing that Rubicon which separates the federal government from state government. Great deference should be shown jail officials in matters that concern the day-to-day operations of their institution. Nevertheless, plaintiffs have presented substantial, often compelling, evidence of long-existing and continuing Constitutional violations. The evidence has established that the totality of conditions at the Ouachita Parish Jail violates the Eighth and Fourteenth Amendments to the United States Constitution. Except in fashioning the necessary remedies, deference is no longer possible.

## I.

### Findings of Fact

Many issues in this complicated litigation were settled in the partial consent decree

---

8. Among the rights guaranteed those convicted of a crime are:

Protection by the equal protection clause of the fourteenth amendment against individious discrimination on the basis of race, *see Lee v. Washington*, 390 U.S. 333, 88 S.Ct. 994, 19 L.Ed.2d 1212 (1968); religious freedom by the first amendment, *see Cruz v. Beto*, 405 U.S. 319, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972); security against deprivation of life or property or additional deprivation of liberty without due process by the fourteenth amendment, *see Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974); freedom of speech by the first amendment, *see Pell v. Procunier*, 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974), and protection by the eighth amendment from cruel and unusual punishment, *see Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976).

*Jones v. Diamond* at 1368.

attached as Appendix A. Culminating the parties detailed discovery was a meaningful stipulation of facts submitted by the parties at trial as Joint Exhibit 1:

## A.

### Stipulated Facts

(1) Plaintiffs' attorneys and the attorney for the Sheriff have reached an agreement on the dimensions of the cells and other pertinent areas within the jail. Those dimensions will be submitted to the court by stipulation;

(2) As of May 15, 1979, inmates were not given the opportunity for outdoor exercise;

(3) Visitors are limited to three family members and one friend;

(4) Inmates without family members are not allowed to substitute friends for family members on the visitors' list.

(5) Ouachita Parish Jail has no library and does not supply reading material to inmates;

(6) Guards on duty are allowed to censor the reading material brought to the jail;

(7) Inmates eat in their cells, and there are no tables or chairs provided for them;

(8) At times, overcrowding in both the women's cells and men's cells has required that some inmates sleep on the floor due to a shortage of bunks;

(9) Inmates, other than trustees, do not leave their cells at any time during the day except for court appearances and consultation with attorneys;

(10) As of May 15, 1979, no outdoor nor indoor exercise programs were in effect at the Ouachita Parish Jail;

(11) The Ouachita Parish Jail does not have a law library and the Sheriff and Police Jury do not make available to inmates persons trained in law;

(12) On visiting days, visitors must talk through a barrier and there is no privacy;

(13) Inmates are not provided with sheets;

(14) There are no written standards for the guards in the determination of what books or magazines will not be allowed in the jail;

(15) Books brought to the jail by inmates' friends and relatives have sometimes been kept from inmates without explanation;

(16) Women inmates are not allowed to serve as trustees or to participate in work-release programs;

(17) Women inmates who are convicted and who are minimum security risks are housed only at the Ouachita Parish Jail, and hence are housed in more restrictive conditions than are similarly situated men who are housed at the Ouachita Area Multi-Parish Prison Farm.

## B.

### By The Court

*Overcrowding*

(1) Constructed in 1926, the Ouachita Parish Jail is located on the fourth and top floor of the Ouachita Parish Courthouse, situated in downtown Monroe, the major city in Northeast Louisiana. The jail underwent an addition in 1966 and another renovation in 1971. (Hereinafter, the Ouachita Parish Jail will sometimes be referred to as "the jail").

(2) The jail contains 5,100 square feet and houses an average of 120 inmates.[9] The jail operates in conjunction with the Ouachita Area Multi-Parish Prison Farm. (Hereinafter referred to as "the farm.")

(3) At any time, the jail may house convicted prisoners serving parish time, convicted state prisoners awaiting appeal or transfer, and pre-trial detainees. Pre-trial detainees generally comprise over 50% of jail population.[10] Although most of the

---

9. The evidence showed as many as 157 inmates housed in the facility. At the time of trial, the population dropped to 113.

10. *See* PX–10 and Trial testimony ("Tr. t." denotes trial testimony) of Deputy H. B. Sullivan, Director of Ouachita Parish Jail since 1976.

population is short-term, some of the inmates have been in Ouachita Parish Jail for as long as five years.[11] The citizens of Ouachita Parish have long recognized that problems existed on top of their courthouse:

> On Ouachita Parish Jail—We found this jail to be well-kept and clean. There were 123 prisoners incarcerated there during our inspection. Living conditions are extremely crowded and there is no room for expansion. For these reasons, we ask that the voters of Ouachita Parish give due consideration to the election set for April 7.

PX-4, March 30, 1979 Report of the Ouachita Parish Grand Jury. The Grand Jury report introduced into evidence as Plaintiff's Exhibit No. 2 contained similar statements. But the sounds of coins clanging out of the coffers caused needed changes to be neglected.

(4) The evidence conclusively established that the Ouachita Parish Jail is desperately overcrowded. Although the situation has been ameliorated since the institution of this suit, on the day of trial, all experts, including *defendants*, testified that the jail was severely overcrowded.[12]

(5) The layout of the jail as shown in Plaintiffs' Exhibit No. 6 is unusual in that there is not one long hall with dormitory-type cells. Instead, the top floor of the courthouse has been divided into several compartments containing cell blocks, a dormitory and individual cells. This haphazard layout belies any contention that the current design is the optimum use of the space available.[13]

(6) Although the number of inmates housed in the jail varies, the daily jail report containing inmate population and classification showed a high of 133 inmates.[14]

11. Tr. t. of Inmate Sandra Topazi.

12. Tr. t. of Dr. Paul Ware. *See also*, Tr. t. of Warden Gene Scroggy and correction administrator Nina Sulzer.

13. Both plaintiffs' expert, Gene Scroggy, and defendants' expert, Nina Sulzer, testified in detail about changes in the physical plan that would result in better use of available space.

This is more than twice the number of inmates allowed by the State Fire Marshal's regulations for a cellblock facility.[15]

(7) The dimensions of the various cells and the square feet per inmate housed is as follows:

Cellblocks [16]

| Cell Name | Dimensions | Total Sq. Ft. | No. of Bunks | Sq. Ft. Per Inmate |
|---|---|---|---|---|
| F–1 Cells | 5' x 8' | 40 | 2/cell | 20 |
| Day Rm. | 32' 6" x 6' 8" | 216.6 | | |
| F–2 – Same as F 1 | | | | |
| C–1 Cells | 8' 6" x 7' | 59.5 | 4/cell | 14.9 |
| Day Rm. | 6' 1" x 41' 2" | 250.4 [1] | | |
| C–2 – Same as C ·1 | | | | |
| L–1 Cells | 7' 7" x 8' | 60.6 | 4/cell | 15.2 |
| Day Rm. | 4' 6" x 40' 10" | | | |
| K –Tank | 5' 8" x 7' 10" | 44.4 | 2/cell | 22.2 |
| Day Rm. | 4' 8" x 25' 9" | 120.14 | | |

Dormitory-Type Cells

| | | | | |
|---|---|---|---|---|
| D | 9' 8" x 26' 9" | 258.4 [2] | 10 | 25.8 |
| E | 10' x 26' 8" | 266.2 [2] | 10 | 26.6 |
| G | 10' 11" x 21' 2" | 240.8 [2] | 10 | 24.1 |
| Trustee's Dorm | 15' 3" x 47' 2" plus 6' 8" x 9' 10" | 784.8 | 18 | 43.6 |

Single and Double Cells

| | | | | |
|---|---|---|---|---|
| A [3] | 6' 5" x 7' 1" | 37.8 | 1/cell | 37.8 |
| Day Rm. | 3' 6" x 11' 5" | 40 | | |
| B [3] | 7' 7" x 7' 5" –2' 1" x 2' 10" | 50 | 2/cell | 25 |
| Day Rm. | 3' 6" x 8' 4" | 29.2 | | |
| J | 7' x 9' 10" | 76.8 | 2/cell | 38.4 |
| H—Same as J | | | | |
| Holding Cell | 7' 5" x 17' 11" | 132.9 | None | N/A |

1. Includes the shower space.
2. Total square footage for dormitory-type cells includes the shower space
3. These cells are not regular rectangles and the computation of square footage requires the subtraction of the square footage taken up by outcroppings in the cell wall.

14. *See* PX–10. PX–7 and the testimony of Deputy Sullivan indicated that as many as 149 inmates were recently incarcerated in Ouachita Parish Jail.

15. *See* PX–25.

16. This table is taken from Plaintiff's Pretrial Memorandum of May 4, 1979. The figures were supported by the evidence adduced at trial particularly PX–6 as corrected.

(8) Plaintiffs' Exhibits No. 17 through 22 consisted of various professional publications in the field of prison administration.[17] These books and pamphlets, cover all aspects of prison administration and maintenance; each also contained a statement on suggested square footage per inmate. The consensus is 80 square feet per man when inmates are locked in for more than 10 hours per day:

> There is one inmate per room or cell, which has a floor area of at least 60 square feet, providing inmates spend no more than 10 hours per day locked in, exclusive of counts; when confinement exceeds 10 hours per day, there are at least 80 square feet of floor space. (important)

Plaintiff's Exhibit No. 18, *American Correctional Association: Manual of Standards for Adult Correctional Institutions*, § 4142, p. 27. This court is mindful of the teaching in *Bell v. Wolfish*, 441 U.S. 520, 543 to 544 n.27 99 S.Ct. 1861, 1876 n.27, 60 L.Ed.2d 447 (1979):

> And while the recommendations of these various groups may be instructive in certain cases, they simply do not establish the constitutional minima; rather, they establish goals recommended by the organization in question. For this same reason, the draft recommendations of the Federal Corrections Policy Task Force of the Department of Justice regarding conditions of confinement of pretrial detainees are not determinative of the requirements of the Constitution.

*See also Rhodes v. Chapman*, 452 U.S. 337, 101 S.Ct. 2392, 2400 n.13, 69 L.Ed.2d 59 (1981). These space requirements can be the springboard launching our discussion of the overcrowded condition at the Ouachita Parish Jail. Even more telling is the State Fire Marshal's opinion that 60 square feet per inmate should be allowed for cell-type incarceration and 80 square feet per prisoner for dormitory-type space.[18]

(9) The small number of square feet allotted each inmate at the Ouachita Parish Jail is particularly compelling since the prisoners rarely leave their cells except for court appearances, medical problems or attorney visits. As stated by Warden Scroggy, this situation is known as "total lock-down" where nobody moves 24 hours a day. When coupled with a total lock-down situation, the small square footage per inmate becomes particularly egregious.[19]

(10) Both plaintiffs' expert, Warden Scroggy, and defendants' expert, Nina Sulzer, agreed that the facility was overcrowded. In their testimonies, each expert also stated that they did not blindly apply a mathematical formula to determine the number of inmates to be housed on the top of the Ouachita Parish Courthouse; rather, each viewed the physical plan and considered its vagaries before rendering an opinion on the number of inmates that may constitutionally be housed.[20]

(11) This condition of overcrowding plus total lock-down has been eased since this lawsuit was instituted. The defendants have agreed to open an outdoor recreation

17. The professional publications introduced into evidence by plaintiffs included:

P 17—ABA Tentative Draft Statutes Relating to Standards Relating to the Legal Status of Prisoners.
P 18—American Correctional Association: Manual of Standards for Adult Correctional Institutions.
P 19—National Sheriffs' Association Manual on Jail Administration.
P 20—National Sheriffs' Association Handbook on Jail Security, Classification and Discipline.
P 21—National Advisory Commission on Criminal Justice Standards and Goals. *Report on Corrections.*

P–22—American Correctional Association: Model Correctional Rules and Regulations.

18. "State Codes also are a valuable index into what levels of decency the public, expressing itself through the Legislature, is prepared to pay for." *Williams v. Edwards*, 547 F.2d 1206, 1214 (5th Cir. 1977).

19. *See* Tr. t. of Donny Hicks, an inmate at the jail since December of 1978.

20. "A simple mathematical calculation of total square feet of space divided by a standard of square feet per man may not necessarily be appropriate or practical." *Williams v. Edwards, supra,* at 1215.

area on the roof of the jail with exercise scheduled for one hour, three days a week. Exercise, educational opportunities and other activities will greatly ease the overcrowded conditions at the jail.

(12) Unfortunately, the current physical structure of the jail does not allow freedom of movement by the inmates and idleness is the hallmark of each day: breakfast served 5:30 to 6:30; 9:00—court call; 10:30 to 11:30, mail call and lunch served; supper served 3:30 to 4:00; lights out—10:00 p.m., Monday through Friday and 12:00 Saturday and Sunday. Prisoners are fed in their cells with the food pushed under a dirty cell door and slid on the floor. Since there is no day room or cafeteria for most cells, many of the prisoners sit on their bunks or toilets to eat.[21]

(13) The showers and toilets are not segregated from the living quarters. The toilet and shower stall are located at the end of the cell. There is no partition separating the toilet from the bunk area and there is no shower curtain on the stall. Dr. Ware testified that on his inspection of the jail, no announcement was made by the deputies to notify inmates of a visitor. Dr. Ware could see the facilities in use as he toured the jail.

(14) Total lack of privacy, inability to escape from the presence of other inmates and total idleness causes the overcrowded conditions of Ouachita Parish Jail to be constitutional deprivation with devastating physical and emotional consequences.

(15) Dr. Ware was accepted as an expert in forensic psychiatry. He toured the prison and drew upon literature in the field as well as his own experience with forced confinement situations. In his opinion, the Ouachita Parish Jail is grossly overcrowded by about 15 to 20 square feet per inmate. These conditions will increase homosexual activity and encourage aggressive and psychotic or suicidal behavior since there is no territorial space allotted an inmate. Dr. Ware testified that he saw signs of evident emotional and mental trauma similar to that noted by the district court in *Adams v. Mathias,* 458 F.Supp. 302, 305 (M.D.Ala. 1978), *aff'd* 614 F.2d 42 (5th Cir. 1979):

> The overcrowded conditions overtaxed the plumbing and sanitary facilities, increasing the hazards to health. In addition, forcing inmates to live in too close proximity with other inmates is psychologically debilitating and leads to an increase in tension and problems. This overcrowding also poses a protection problem.

(16) Warden Scroggy also testified that when an inmate has approximately 22 square feet of space in a total lock-down situation incidents of inmate violence such as rape and fights are increased.

(17) Several of the cells in the Ouachita Parish Jail had no windows.[22] Rats and roaches infest the cell areas. The only real inmate activity besides limited reading and television viewing is gambling.

(18) This overcrowding and total lock-down situation is more intense for the women in the facility since they are not allowed to be trustees and enjoy a more open dormitory-type cell.[23]

*Inadequate Supervision*

(19) A necessary concomitant to overcrowding is inadequate supervision of inmates allowing for increased inmate vio-

21. *See* Tr. t. of inmate Hicks and Mark Sutton.

22. La.R.S. 15:753 provides:
 All cells shall be placed against the walls, *so that each cell may have one or more windows opening to the outside, to insure an abundance of sunlight and fresh air,* and be provided with lavatory, drinking fountain, and water closet, where water or sewer connections are to be had in the town or city. Each cell shall open into a corridor which shall be provided with sanitary drinking fountain and a shower bath, with hot and cold water, shower for males and tubs for females. (Emphasis supplied)
 Further, La.R.S. 15:752(B) states:
 The building shall be fireproof, screened, properly ventilated, sufficiently lighted, by day and night, adequately heated, and connected with water and sewer where water or sewer connections are to be had in the town or city.

23. *See* Tr. t. of female inmates Sandra Topazi and Deborah Higginbotham.

lence and self-abuse. At the time that the lawsuit was instituted, the Ouachita Parish Jail was desperately understaffed. The few guards were poorly trained. Only a high school diploma and a lie detector test separated any individual from a guard's uniform. No special training in corrections was required nor was any test administered to determine if character defects existed which would flag a potentially brutal or sadistic applicant. The prerequisites for being a guard at the jail are the same as being a patrol deputy with the general work force of the Ouachita Parish Sheriff's Department.[24]

(20) The reason for this lack of training is unclear. Warden Scroggy testified that LSU-Baton Rouge has a three-day training course in corrections. The staff will come to the facility to deliver the course. The National Association of Corrections will pay the costs of this course and even offer its technical assistance at no additional charge. National courses are taught in Boulder, Colorado, for both male and female corrections administrators. There is a Department of Corrections school located in Louisiana. State and Federal funds were available through the Law Enforcement Assistance Administration. Both Warden Scroggy and defendants' expert Nina Sulzer testified that forty to eighty hours of training were necessary for prison guards. This training should be supplemented yearly. The guards at the Ouachita Parish Jail receive no training whatsoever other than on-the-job experience.

(21) Concurring with the experts, Director Sullivan agrees that he is understaffed. At the time the suit was filed, up to 140 inmates could be monitored by two to three deputies. These deputies would also have the responsibility for all booking and paper work which would consume a large part of one deputy's time. Currently, a new matron has been hired to handle the female inmates. Deputy Simmons testified that on Tuesday through Friday, four deputies plus himself and Director Sullivan handle the jail. On Saturday, there are three deputies and on Sunday and Monday, two. In the evening, two deputies are on duty.

(22) Considering the large inmate population and the compartmental shape of the cellblocks in the Ouachita Parish Jail, the court finds that the jail is drastically understaffed.

(23) Testimony established that several cells could not be checked by a casual glance: some were closed by steel doors with only a viewport and others were poorly lighted with obstructing physical structures. In some cells, the deputy would have to physically enter the cell to make an adequate inspection. The situation is especially severe at night when all inmates in the bullpens are locked down.

(24) The only way an inmate could get the attention of a deputy was to raise a noise, either by hollering or by banging on the cell bars.[25] The ineffectiveness of this particular type of alarm system is obvious. Plaintiff's Exhibit No. 8, Jailer's Daily Security Log, contains several incidents of a deputy's failure to respond to such an alarm.

(25) Camera monitors are not in the actual cells, but only the run-arounds. Cells A, B, J, H and all female cells have no camera monitor whatsoever.[26] The poor lighting renders the existing monitors functionally questionable.[27]

---

24. *See* Tr. t. of Sheriff Bailey Grant. Before becoming director of the jail, Deputy Sullivan worked in the oilfield.

25. *See e.g.*, Tr. t. of Director Sullivan and Deputy Simmons.

26. Tr. t. Deputy Simmons.

27. PX-3, The Ouachita Grand Jury Report of January 6, 1978 contains the following recommendation:

> ...We recommend that a study be made to determine if additional closed-circuit television monitors can be installed to provide additional surveillance of prisoners. We recommend that a study be made to determine if the audio speaker/listening system now used in the cells and cellblocks can be upgraded and expanded. We recommend that a study be made to determine if additional jail personnel are needed especially during night time periods and on weekends.

(26) The unfortunate results of this inadequate staffing and almost total lack of meaningful supervision is non-existent prisoner protection. Acknowledging the inmate bias, the court found inmates Donnie Hicks and Darrell Newton to be credible witnesses who testified that fights, sexual threats, prisoner beatings and homosexual rapes were a reality in the Ouachita Parish Jail. The court was particularly alarmed at the testimony establishing the number of beatings that were accomplished by weapons. Director Sullivan testified that shakedowns did occur and weapons would be found.

(27) The court finds that these shakedowns were infrequent and that prisoners had easy access to weapons such as broomsticks, razorblades, wire and rope.

(28) In discovery responses, defendants admitted convictions for rape occurring inside the Ouachita Parish Jail.[28] Defendants attempted to impeach the credibility of an inmate who testified that he was raped at the age of 18 in the Ouachita Parish Jail. Whether this one incident occurred or not, "[c]ourts have taken judicial notice that most acts of violence go unreported in prison." *Ramos v. Lamm*, 485 F.Supp. 122, 141 (D.Colo.1979), *modified* 639 F.2d 559 (10th Cir. 1980), *cert. denied*, 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 239 (1981).

(29) Even a cursory review of the medical records, and Jailer's Daily Security Log, shows an unusually high rate of stabbings, assaults, fights, threats, suicide attempts and self-mutilation. Female inmate, Sandra Topazi, testified that an inmate by the name of Regina Brown attempted suicide on more than one occasion. A review of these exhibits also shows that deputy patrols were infrequent and haphazard and that inmates' attempts to get the guard's attention by banging on cell bars were often ignored. The following summary was compiled in plaintiff's post-trial brief and contains incidents from Plaintiff's Exhibit No. 8:

**28.** *See* Defendants' Response to Request for

| | |
|---|---|
| 3/21/77: | Disturbance and fire in C–1 and C–2. |
| 3/31/77: | Fight in D cell. |
| 4/11/77: | "... Bobby Simpson bang the door to G cell. Upon checking Simpson told me that Inmates Larry Mercer and James Foste had cut their arms and was bleeding pretty bad. Called the Sgt. and sent them to the hospital." |
| 4/14/77: | "Shift ran pretty smooth, an awful lot of bar rattling, must not have been important. They finally quit." |
| 5/22/77: | "Heard rattling in G cell. Sent Hall help to check due to fact I was very busy. Inmate Macleod had been hit with a broom and was bleeding very bad from a head wound ..." |
| 5/22/77: | Inmate refused to go into his cell at lockdown. He told deputies he had been beaten with a plunger handle. He also told deputies a knife had been pulled on him and that he had been raped. |
| 5/23/77: | Inmate swallowed wood splinters, pieces of plastic spoon and 4 razor blades. |
| 6/20/77: (at 6/21/77) | "At approx. 2145 hrs. "D" cell was noisy; Upon checking Jerry Ronquill and Olinde were fighting, I moved Ronquill to "A" cell with Gary Davis." |
| 8/12/77: (at 8/3/77) | "... a lot of noise coming from C–1. Upon checking Inmate Curtis Ray Talley who had been running his head – about all those "niggers and Boys" in the Bullpen was at this time wanting to get out of cell. His sporting blood had turned to chicken crap. I removed 2 sections of Broom handle and a coil of wire from last cell – I moved Talley to "E" cell and told inmates in C–1 I wanted all their guns or knives and chains or there would be a shakedown in the morning. I suggest a shakedown be held and contraband be removed. Sgt. notified." |

No recordation of subsequent shakedown.

| | |
|---|---|
| 8/21/77: (at 8/4/77) | "I got Peter White out of F–1 and he informed me that there were some wire weapons in every cell except # 4 and over the shower." |

No recordation of subsequent shakedown.

| | |
|---|---|
| 8/14/77: (at 8/4/77) | Escape of inmate. |
| 8/21/77 | "At 1930 hours: Loud knocking from L 1. Upon checking I found Inmate Jerry Brown B/M in a seizure. After having Cowboy, Gene Wall, and a couple of other trustees bring Brown out to desk he started coming out of seizure. I could tell that someone had stabbed Brown several times. ... Jerry Brown at this time told me that he was sitting in cell # 2 of L–1 when Willie Myles began accusing him of taking $7.00 from _____ Scott a black male at this time Myles started stabbing him. Brown was stabbed 2 times on left arm, 1 time above left pap (sic), once on right shoulder (front) and once on outer side of elbow ... Also several shanks and sticks in L–1 This cell needs a good shakedown." |

No record of subsequent shakedown.

| | |
|---|---|
| 9/6/77: (at page 8/8/77) | Rape of Michael Brantley. Brantley's father came to the jail and asked that Brantley be put in a cell by himself. "I advise Mr. |

Admissions, filed September 20, 1978.

9/6/77: (at page 8/8/77) Brantley at this time we had 146 inmate in jail and did not have a place to put him I asked him for what reason did he want his son in a cell alone. He said his son told him that inmates in L 1 are fooling with him. I asked Michael had they bother him in any way. He said no, but that they were trying to. I then told his father I would move him to 'D' but that he would have to sleep on the floor. I then went back to C-1 with Michael to get his belonging as to getting him out. I talked to him. He said that three blacks had rape him last night. I asked would he give me their names. He said no, that he didn't want anything done about it because they told him they would kill him ..." Sgt. J. B. Simmons.

9/13/77: 1430 hrs. "On the above date and indicated time I reported a rape of W/M. Subject Garland Wayne White has been raped while in cell block F-1."

10/30/77: 2310 hrs. "Heard noises coming from B cell. Upon checking found inmate Walker getting beat up. Held off Inmate while got Walker out of cell ..."

12/20/77: "At approximately 2030 hrs. inmates in L 1 starting beating on the cell door. I went back to ask them what was wrong and nobody would say anything. I then notice Inmate Nathaniel Jones lying on the floor at the back of the cell. His head had been busted open and he had also been bitten in the chest and who knows what else . ."

1/1/78: 0030 hours. There was a noise in E cell. Upon checking two inmates had been fighting. Inmate Byrd had hit Inmate Joiner in the face with his fist. An outside patrol was called and transported Inmate Joiner to the hospital.

1/6/78: "On this date and time Inmate Robert Byrd in E cell stuck Bobby Chinger with a piece of broomstick. This is about the 3rd night in a row that he and others in this cell have attacked recent lock ups, Chinger was only locked up for about 10 minutes."

1/22/78: "At approx. 1905 hrs. heard loud noises coming from 'K tank'. Someone was hollering for Help. I called the operator and advised him something was happening in 'K tank'. I went back to 'K tank' to check. Found Clarence Adams on his knees in hallway. I locked everyone else in their cells. Sergeant O'Conner and myself went inside and hand cuffed him and brought him to the office to talk to him - Clarence Adams advised Sergeant Conner and myself that Isac Smith and Thom Adams had beat him up."

1/23/78: Fight in G cell. Took stick and antenna away from Thomas.

1/26/78: Fight in "g" cell. Doctored John Lowery and moved two inmates to C-1.

1/27/78: "John Kim stated that he had broken his hand when he hit David Johnston on the head about 1930. A car was called to take inmate Johnston to Conway.

1/28/78: (at 1/29/78) "At 2010 hrs heard loud noise in G cell. Upon checking Jerry Ronquille had cut his left wrist. Deputy willis and myself applied medication and bandages and returned him to "G" cell.

2/23/78: "Inmate Parnell had cut his left wrist three or four times. Sergeant Simmons advised he saw him swallow a piece of broken razor blade. Deputy Rogers took him to Conway.

5/3/78: "The count is wrong as usual. I had a card in the (H's) on Grover Horton, he's signed out on the page for 5-02 78 but his card is marked through on date, time, and auth. What is his status. There is no cell location on his card. Where is Donald White? Its not on the card. He's not on the book. I should be one over. (I located him in "E" cell. The count is now correct. This is a problem nearly every night."

5/05/78: "I received Inmate Jackson and Surratt from farm for fighting. I put Inmate Jackson in C-1, Surratt in C-2. Surrat was hit from behind by persons unknown possibly (Charlie Carter) and had to be sent to Conway for stiches in right eye and behind right ear."

5/10/78: "About 1830 hrs. knock on F 2 and answered by intercom and was told 2 inmates had cut wrist. Doctored Yvonne Burger and bandaged Carolyn Rose wrist."

5/26/78: "I Deputy Walker received a phone call from Attorney Jean Osborn about 1800 hrs this date. He wanted to know why Carolyn Davis was put in the same cell with Carolyn Rose. He said Rose's sister had called him, stating her family was going to sue the sheriff department, because we allowed Davis into the same cell with Rose, and Davis raped her. Sgt. Simmons came up to the jail to talk with this att. We sent Carolyn Rose to Conway at 2200 hrs. She arrive back at 2245 hrs. Deputy Susan Stuart give me a container which had a bic pen cap in it, this was found by Dr. Caufman up in Carolyn Rose ..."

5/30/78: (at 6/2/78) "At approx. 1615 hrs. Dy. Trichel and Dy. Sullivan observed a fight in L 1. Upon checking L-1 inmate Charlie Center and Rodney Eakers were fighting. Dy. Sullivan, Dy. Trichel, Dy. May and myself removed Eakers from L-1 to medical room. We observed a few bruises and scratches but nothing serious. At approx. 1850 sent Inmate Rodney Eakers to Conway for a check."

6/17/78: Fight in C-2.

2/12/79: "The light in C-1 and C 2 need to be replaced. In C-2 there are so many lights out you can't see the camera or to make a good head count without a flash light. The above request was also written up on 2/7/79".

2/15/79: Fight in C-1.

2/28/79: (Page 3-2-79) "At 0535 hrs. Marco Thucos and Joseph McCarthy got into a fight over the trays. Called Lt. Brown to have Thucos and McCarthy taken to hospital."

3/1/79: "... took inmate Michael Thomas to Conway because he fell and hit his head."

3/4/79: "The above date relieved Dy. Ron Brown of 118 inmates. At 0850 hrs. Radio operator Dy Carrol Wright called Dy Hammond and advised him a rope was hanging off top of the building on the East Side next to the South end of building. Dy. Hammond and I went to 'K' tank and found that we had four inmates missing."

The log and prisoners' testimony establish that guards were often slow to respond to

inmate alarms. On occasion, guards allowed the inmates to fight.

The court is aware that these entries were only made when problems occurred and does not give a true cross-section of the type of supervision rendered on a 24 hour basis. But the testimony of the inmates established a high frequency of violence in the Ouachita Parish Jail. Director Sullivan himself testified that patrols were sometimes infrequent. At the time of trial, 90 minutes may separate patrols. Given the overcrowded conditions and the compartmental physical structure of the jail, the court finds that the type of supervision rendered by the guards of the Ouachita Parish Jail is constitutionally deficient.

(30) Defendants' expert testified that there should be a ratio of one guard to every six inmates to ensure proper security. She also testified that some type of alert system such as an emergency light similar to the one in use in hospitals could increase the prisoners' safety. She testified that the present conditions at the jail did not meet the standards for inmate security. She testified that at least five deputies plus a supervisor should be present during the day shift. On the night shift three deputies should be sufficient if there was a continuous patrolling and each area visited every one-half hour on a random, non-scheduled basis. Warden Scroggy agreed with this estimate but would require more frequent patrolling.

(31) This court is aware that a jail is not a pleasant place to be and houses persons often convicted of violence against other men. A certain degree of fear for physical safety is inherent in any facility incarcerating criminals. But the degree of fear and violence in the Ouachita Parish Jail clearly passes the level of that allowed by the Constitution:

Primary responsibility of jails is to protect society from those it considers dangerous. Likewise, inmates must be protected from each other. Sufficient security is therefore a necessity in any jail. *Smith v. Sullivan*, 553 F.2d 373, 380 (5th Cir. 1977).

*Visitation*

(32) Visiting hours at the Ouachita Parish Jail are on Saturday from 9:00 to 11:00 or from 2:00 to 4:00.[29] The parties have stipulated that no contact visitation is allowed. Children under 14 years of age are not allowed in the jail at any time.[30]

(33) Visitation is conducted in a common room through one of three port windows. There is virtually no privacy and always a high level of noise.

(34) The view windows are supplemented by small holes for vocal communication. It is impossible to speak into these holes while maintaining visual contact with the visitor.[31] Plaintiffs' psychiatric expert, Dr. Paul Ware, testified that the visitation viewports were the most traumatic part of his inspection. He described the visitation room and the small windows with four holes beneath the windows. Dr. Ware testified that it was impossible to look and talk at the same time. In his opinion, effective communication was impossible. His striking analogy was the effectiveness of stating "I love you" to a person whose face you could not see.

(35) The evidence established that the current visitation facilities are inadequate in that they do not provide effective communication between inmates and their visitors. The inadequacy of these facilities was not justified by any legitimate security concern.

(36) Director Sullivan testified that children were not allowed into the jail since they should not be exposed to this type of environment. Defendants did not attempt to explain why children were allowed to visit prisoners at the Ouachita Multi-Parish

29. PX 15.

30. PX 1, p.7 states:
Children under 14 years of age are not allowed in the jail at any time. Children under age must be okayed by the Director, Superintendent, or the Sheriff before they may enter the jail.

31. Tr. t. of inmates Hicks and Sutton.

Prison Farm. Dr. Ware testified that there was no mental or emotional effect on a child seeing his parent in jail. In fact, he testified that the effect on the child would be more positive than negative since he would know where the absent parent was located. The State has a heavy burden in justifying a regulation which has the effect of depriving family members from visitation. *See e.g., Moore v. City of East Cleveland, Ohio*, 431 U.S. 494, 499, 97 S.Ct. 1932, 1935, 52 L.Ed.2d 531 (1977). The evidence is simply devoid of any legitimate reason for not allowing children to visit in the jail.[32]

(37) The officials of the Ouachita Parish Jail testified that security reasons did not allow contact visitation. Contraband could be smuggled into the jail and no facility for searches existed.

(38) Defendants' expert, Nina Sulzer, testified that there was no contact visitation allowed at the Jefferson Parish Jail where she was a consultant since contraband would be smuggled into the jail. Warden Scroggy testified that contact visitation was allowed except for armed robbers, rapists and murderers. Dr. Ware was emphatic in his testimony that physical contact was necessary for emotional and mental health. He testified that touch is literally essential to stay alive. People deprived of touching even resort to beating or physical abuse to get the requisite contact.

(39) Although the court does find that many experts have testified to the importance of contact visitation and the debilitating effects caused by the denial of this visitation,[33] the security risks that would accompany contact visitation cannot clearly be handled in the facility as it exists.

### Access to the Courts

(40) The parties stipulated that the Ouachita Parish Jail does not have a law library and that defendants do not provide the

inmates with personnel trained in the law. The evidence established that inmates are not allowed hardbound books except a Bible. A hardbound law book is prohibited within the confines of the Ouachita Parish Jail. Inmates are allowed to possess only two books in their cell at any one time.

(41) Because of this obvious lack of legal assistance, defendants attempted to prove that adequate access to the courts was provided by the attorney appointments of the district judges. Judge Fred Fudicker, one of the five judges of the Fourth Judicial District, Ouachita Parish, Louisiana testified that the Indigent Defender Board would be appointed to represent prisoners in criminal matters and in habeas proceedings in which a hearing was required. Judge Fudicker further testified that no attorney had ever been appointed to represent a prisoner in a habeas corpus proceeding since none had been requested.

(42) It was clear from Judge Fudicker's testimony that no assistance was provided in the drafting of petitions. Legal assistance is not available to inmates who wish to file civil suits challenging conditions of incarceration or to question matters that have arisen while confined. In fact, Judge Fudicker stated that civil petitions not stating a cause of action or habeas corpus petitions deemed to be frivolous would be dismissed before an attorney was appointed. A prisoner could have an indigent defender appointed to represent him in an appeal, but he would first have to make such a request and have the knowledge to know an appeal was needed. Obviously, Judge Fudicker could testify for his procedures, but not for the procedures of the other four district judges since no written guidelines exist for the handling of the prisoners' legal needs.

The court finds that inmates of the Ouachita Parish Jail are unconstitutionally deprived of their access to the court system. Inmates are not allowed a law library or

---

32. Warden Scroggy testified that children were allowed to visit at the Caddo Correctional Institute.

33. The publications placed in evidence by plaintiffs' counsel also encourage contact visi-

tation. *See, e.g.,* PX–22, p.30. But the particular physical plant must be considered along with the security risks accompanying contact visitation at this jail.

legal assistance for the initial preparation of habeas corpus petitions and civil complaints. The appointment of an attorney at any stage of the proceeding is left to the discretion of the trial judge. Inevitably, this discretion will vary with each of the five district judges since no written guidelines exist.

(44) Defendants attempted to circumvent this deprivation by referring to the attorney staff of the North Louisiana Legal Assistance Corporation. This court is intimately familiar with the statutes and regulations establishing the Legal Services Corporation. *See White v. North Louisiana Legal Assistance Corporation*, 468 F.Supp. 1347 (W.D., La. 1980). In 42 U.S.C., § 2966 et seq., and 45 C.F.R. 1600 et seq., the framework of a Legal Services Corporation is established. The number of staff attorneys is determined by the number of poor people in the parish area served by the corporation. North Louisiana Legal Assistance Corporation does not have the manpower or the funds to provide the representation of all inmates at the Ouachita Parish Jail and other institutions in its service area.[34]

### Censorship of Reading Material

(45) The parties stipulated that the guards on duty were allowed to censor the reading material brought to the jail. Plaintiff's Exhibit No. 5 is a Life magazine that inmates were not allowed to receive.

(46) Although the parties produced little evidence on this issue at trial, it is apparent that no guidelines exist for the censorship of the inmate reading material. Director Sullivan testified that deputies do censor magazines but no guidelines exist. The individual deputy determines if the material is obscene.

(47) The court finds that the discretionary censorship of reading material at the Ouachita Parish Jail violates the prisoners' First Amendment rights. This limitation on the First Amendment right was not justified by any substantial governmental in-

terests and is proscribed by the Supreme Court's decision in *Procunier v. Martinez*, 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974).

(48) The apparent concern of the jail officials was that sexually explicit material should not enter the cells. Although Dr. Ware argued to the contrary, the court need not decide what is or is not obscene within the prison walls. The defendants have not promulgated guidelines to assist the reviewing guard. The present system does not provide for an independent review of the censor's decision. Guidelines and an accompanying review are required by the standards set forth in the Fifth Circuit decision of *Guajardo v. Estelle*, 580 F.2d 748 (5th Cir. 1978). The defendants' failure to comply with this established case law is a direct violation of the prisoners' First Amendment rights.

### Sex Discrimination

(49) The parties stipulated that women were treated differently from men: women are not allowed to serve as trustees or to participate in work release programs, and women inmates who are convicted will be housed only at the Ouachita Parish Jail and not at the Ouachita Area Multi-Parish Prison Farm.

(50) This differentiation was dramatically shown at trial by the testimony of Sandra Topazi. Miss Topazi was sentenced to five years in the Ouachita Parish Jail. Her male accomplice who pleaded guilty to the same offense was sentenced to five years at the Ouachita Area Multi-Parish Prison Farm. Miss Topazi never leaves her cell and cannot be a trustee. The evidence established that conditions at the farm were considerably different from the jail.[35]

(51) Prisoners incarcerated at the farm enjoy contact visitation. Prison farm inmates engage in a work release program so that most inmates are gainfully employed in such things as logging, automotive mechanics and farming. Programs of drug

---

34. *See* Tr. t. of Roland Charles, Executive Director of North Louisiana Legal Assistance Corporation.

35. Tr. t. of Mark Sutton and Warden Scroggy.

and alcoholic abuse are available as well as numerous physical activities such as sports and exercise programs. It is possible for an inmate to pursue his high school education. A bookmobile visits every Saturday. Prisoners enjoy better food, more open space and receive sheets and pillows. The living accommodations are in open dormitory style with 75 single bunks in one building. Footlockers are at the end of each bunk and showers at the end of the dorm. Warden Scroggy testified that the prison population of the farm was generally relaxed and gainfully employed.

(52) The justification for not housing women at the farm—money was not available for the structural changes in the physical plan so that the male and female population could be separated. Warden Scroggy testified that men and women should be treated the same. In his own jail, Caddo Correctional Institute, there is a separate dorm for women. This dorm is surrounded by a chain-link fence and female guards are hired. Most military correctional institutes are now sexually integrated.

(53) The defendants stated that a woman could not be a trustee at the Ouachita Parish Jail since this would allow opportunities for sexual contact between inmates. The court is of the opinion that this problem could be eliminated by proper supervision. Defendants' expert, Ms. Sulzer, testified that women could be trustees.

(54) The evidence established that female prisoners are treated differently from their otherwise similarly situated male counterparts. The defendants advanced no compelling reason for this disparate treatment. The court finds that the current situation existing at the Ouachita Parish Jail violates the equal protection rights of its female inmates.

*Right to Sheets*

(55) Although jail rules state that sheets will be provided to inmates, the parties stipulated that the inmates are not provided with sheets. Sheriff Grant testified that sheets are not provided because no funds are available.

(56) Defendants also introduced evidence that sheets could be a security risk. Ms. Sulzer stated that sheets are not provided at her institution since they may clog the plumbing. Warden Scroggy stated that sheets present no security risk and are issued at CCI.

(57) The inmates at the Ouachita Parish Jail are provided a mattress cover. The mattress cover resembles a mummy bag; an inmate can crawl between the two layers of cloth and tie the cover so that all but his head is covered. One inmate testified that personal safety could be endangered if an inmate had his arms inside the mattress cover since he would not be able to protect himself from attacks by other inmates.

(58) Without a sheet, an inmate is forced to decide between sleeping on a plastic mattress and covering himself with his mattress cover or sleeping on his mattress cover and going without a cover. This dilemma presented by the plaintiffs assumes that the prisoner will not place himself between the two layers of his mattress cover.

The court finds that the defendants did not provide sheets to inmates because of a legitimate security concern as well as for the protection of the plumbing systems and general cell area cleanliness. There is no constitutional deprivation by the state's failure to provide sheets for the mattress since they do provide a mattress cover.

(59) The court finds that the jail area as a whole is clean and not unduly infested with rats or other pests. The prisoners are provided with the basic items of personal hygiene, and for the most part, the sanitation facilities function properly. With the changes that will be accompanied by the partial consent decree, the jail facility should function in a constitutional manner provided the overcrowding and lack of supervision is corrected. The court finds these last two items to be egregious and in need of remedy.

II.

*Conclusions of Law*

(1) This court has jurisdiction over this case pursuant to 28 U.S.C., § 1343(3) and

(4) which authorizes a federal district court to hear suits brought under 42 U.S.C., § 1983. The plaintiffs also seek declaratory relief under 28 U.S.C., § 2201 and § 2202.

■ This court has pendent jurisdiction over plaintiffs' claims arising under Louisiana state law. Plaintiffs presented a substantial federal claim and the state and federal claims arise from a "common nucleus of operative fact." *United Mine Workers v. Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966). *See also, Miller v. Carson*, 563 F.2d 741, 760 (5th Cir. 1977); *Taylor v. Sterrett*, 499 F.2d 367, 368 (5th Cir. 1974), *cert. denied*, 420 U.S. 983, 95 S.Ct. 1414, 43 L.Ed.2d 665 (1975).

(2) The plaintiffs have satisfied all requirements to proceed as a class action[36] and all defendants are properly before the court. The parties stipulated that defendants' actions occurred under color of state law.

(3) As stated earlier, this court adheres to the prevailing Supreme Court attitude concerning a federal court's intervention into jail administration:

> Traditionally, federal courts have adopted a broad hands-off attitude toward problems of prison administration. In part this policy is the product of various limitations on the scope of federal review of conditions in state penal institutions. More fundamentally, this attitude springs from complementary perceptions about the nature of the problems and the efficacy of judicial intervention. Prison administrators are responsible for maintaining internal order and discipline, for securing their institutions against unauthorized access or escape, and for rehabilitating, to the extent that human nature and inadequate resources allow, the inmates placed in their custody. The Herculean obstacles to effective discharge of these duties are too apparent to warrant explication. Suffice it to say that the problems of prisons in America are complex and intractable, and, more to the point, they are not readily susceptible of resolution by decree. Most require expertise, comprehensive planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government. For all of those reasons, courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform. Judicial recognition of that fact reflects no more than a healthy sense of realism....

*Procunier v. Martinez*, 416 U.S. 396, 405, 94 S.Ct. 1800, 1807, 40 L.Ed.2d 224 (1974). *Accord, Rhodes v. Chapman*, 452 U.S. 337, 101 S.Ct. 2392, 2400 n.13, 69 L.Ed.2d 59 (1981); *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974); *Bell v. Wolfish*, 441 U.S. 520, 531, 99 S.Ct. 1861, 1870, 60 L.Ed.2d 447 (1979); *Jones v. Diamond*, 636 F.2d 1364 (5th Cir. 1981) (*en banc*).

■ (4) But when constitutional deprivations are established, the federal court is bound to discharge its duty to protect constitutional rights. *Procunier v. Martinez, supra; Hutto v. Finney*, 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978); *Smith v. Sullivan*, 611 F.2d 1039 (5th Cir. 1980). "[T]he Constitution does not stop at the prison gate, but rather inures to the benefit of all, even to those citizens behind prison walls." *Battle v. Anderson*, 447 F.Supp. 516, 524 (W.D.Okl., 1977). Although the plaintiffs attacked various facets of the Ouachita Parish Jail which allegedly violated different constitutional provisions, the primary source of attack springs from the Eighth Amendment's prohibition of cruel and unusual punishment.

■ (5) It has been both a settled and first principle of the Eighth Amendment that penal measures are constitutionally repugnant if incompatible with the "evolving standards of decency that mark the progress of a maturing society," *Trop v.*

---

**36.** *See* Federal Rules of Civil Procedure 23(a) and (b)(2). The court's certification of two sub-classes is covered in Footnote 1.

*Dulles,* 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 596 or if they "involve the unnecessary and wanton infliction of pain." *Gregg v. Georgia,* 428 U.S. 153, 171, 96 S.Ct. 2909, 2924, 49 L.Ed.2d 859 (1976). *Accord, Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976). A measure is unnecessary and wanton if found to be "totally without penological justification." [37] *Gregg v. Georgia, supra,* 428 U.S. at 183, 96 S.Ct. at 2929. *See generally, Coker v. Georgia,* 433 U.S. 584, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977).

▆▆ (6) The Eighth Amendment's limitations upon the conditions in which the federal government may confine those convicted of a crime are applicable to the states through the Fourteenth Amendment. *Robinson v. California,* 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962). Challenges to conditions of confinement are valid Eighth Amendment attacks since such conditions may constitute cruel and unusual punishment. *Rhodes v. Chapman, supra;* [38] *Estelle v. Gamble, supra; Hutto v. Finney, supra;* and, *Ingraham v. Wright,* 430 U.S. 651, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977).

(7) In the Fifth Circuit, the courts have examined the totality of conditions to determine if the overall jail environment amounts to cruel and unusual punishment proscribed by the Eighth Amendment:

In determining whether conditions of confinement are unconstitutional under the eighth amendment or the fourteenth amendment, we do not assay separately each of the institutional practices but look to the totality of conditions.

*Jones v. Diamond,* 636 F.2d 1364, 1368 (5th Cir. 1981) (*en banc*); *Williams v. Edwards,* 547 F.2d 1206 (5th Cir. 1977). The principle first appeared in *Gates v. Collier,* 501 F.2d 1291, 1309 (5th Cir. 1974):

Each factor separately, i.e., overcrowding dormitory barracks, lack of classification according to severity of offense, untrained inmates with weapons, lack of supervision by civilian guards, absence of a procedure for confiscation of weapons, may not rise to constitutional dimensions; however, the effect of the totality of these circumstances is the infliction of punishment on inmates violative of the Eighth Amendment, as determined by the trial court.

*Accord, Smith v. Sullivan,* 553 F.2d 373 (5th Cir. 1977); *Miller v. Carson,* 563 F.2d 741 (5th Cir. 1977). Applying this principle to the facts found by this court, the conditions of confinement at Ouachita Parish Jail violate the Eighth Amendment rights of convicted inmates housed at this parish jail.

▆ (8) While the Eighth Amendment applies to convicted prisoners, the due process clause of the Fourteenth Amendment prohibits conditions that amount to punishment of the unconvicted. *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447

---

**37.** In *Pell v. Procunier,* 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974), the Supreme Court identified three legitimate penal objectives: internal security, rehabilitation and the isolation of criminals from society.

**38.** In *Rhodes v. Chapman,* 452 U.S. 337, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981), the court held that conditions of confinement are subject to Eighth Amendment scrutiny:

These principles apply when the conditions of confinement compose the punishment at issue. Conditions must not involve the wanton and unnecessary infliction of pain, nor may they be grossly disproportionate to the severity of the crime warranting imprisonment. In *Estelle v. Gamble, supra,* we held that the denial of medical care is cruel and unusual because, in the worst case, it can result in physical torture and in less serious cases, it can result in pain without any peno-

logical purpose. 429 U.S. at 103 [97 S.Ct. at 290]. In *Hutto, supra,* the conditions of confinement in two Arkansas prisons constituted cruel and unusual punishment because they resulted in unquestioned and serious deprivations of basic human needs. Conditions other than those in *Gamble* and *Hutto,* alone or in combination, may deprive inmates of the minimal civilized measure of life's necessities. Such conditions could be cruel and unusual under the contemporary standard of decency that we recognized in *Gamble.* 429 U.S. at 103–104 [97 S.Ct. at 290–91]. But conditions that cannot be said to be cruel and unusual under the contemporary standards are not unconstitutional. To the extent that such conditions are restrictive and even harsh, they are part of the penalty that criminal offenders pay for their offenses against society.

(1979); *Jones v. Diamond*, 636 F.2d 1364 (5th Cir. 1981) (*en banc*); *Miller v. Carson*, 563 F.2d 741 (5th Cir. 1977); *Mitchell v. Untreiner*, 421 F.Supp. 886 (N.D. Fla.1976). To determine if an existing prison condition equals "punishment" the Supreme Court provides the following test:

> In evaluating the constitutionality of conditions or restrictions of pretrial detention . . . we think that the proper inquiry is whether those conditions amount to punishment of the detainee.
>
> \* \* \* \* \* \*
>
> . . . Absent a showing of an expressed intent to punish on the part of detention facility officials, that determination generally will turn on "[w]hether an alternative purpose to which [the restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it]." [Citation omitted.] Thus, if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to "punishment." Conversely, if a restriction or condition is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees *qua* detainees. [Citation omitted.] Courts must be mindful that these inquiries spring from constitutional requirements and that judicial answers to them must reflect that fact rather than a court's idea of how best to operate a detention facility.

*Bell v. Wolfish*, 441 U.S. at 535–539, 99 S.Ct. at 1872–1874. (Footnotes omitted.)

(9) Pretrial detainees account for over fifty (50%) percent of the inmates in Ouachita Parish Jail. These inmates have not been found guilty of any crime. Some are awaiting arraignment; others have had only a judicial determination of probable cause as a prerequisite to the extended restraint of liberty following arrest. *Gerstein v. Pugh*, 420 U.S. 104, 114, 95 S.Ct. 854, 863,

43 L.Ed.2d 54 (1975). They all share a common status—inability to make bond. Considering the strong presumption of innocence enjoyed by every accused, these unconvicted inmates deserve a closer scrutiny when conditions of confinement are examined.

(10) The importance of this distinction between the convicted prisoner and the inmate restrained without adjudication was recognized by the Supreme Court in *Ingraham v. Wright*, 430 U.S. 651, 671–2, n. 40, 97 S.Ct. 1401, 1412–13 n.40, 51 L.Ed.2d 711 (1977):

> Eighth Amendment scrutiny is appropriate only after the State has complied with the constitutional guarantees traditionally associated with criminal prosecutions. *See United States v. Lovett*, 328 U.S. 303, 317–318, 66 S.Ct. 1973, 1979–1080, 90 L.Ed. 1252 (1946) . . . . [T]he State does not acquire the power to punish with which the Eighth Amendment is concerned until after it has secured a formal adjudication of guilt in accordance with due process of law. Where the State seeks to impose punishment without such an adjudication, the pertinent constitutional guarantee is the Due Process Clause of the Fourteenth Amendment.

*Accord, Bell v. Wolfish*, n.16. The same "totality of conditions" standard is appropriate when analyzing the alleged constitutional deprivations of pretrial detainees. *Miller v. Carson, supra*, n.6; *Mitchell v. Untreiner, supra* at 894. Considering that the restraints imposed on pretrial detainees are simply measures to assure their presence at trial, constitutional deprivations become particularly egregious. Based on the findings of this court, the defendants' policies and practices violated the due process clause; any punishment of a person presumed innocent is unconstitutional.

(11) Finding the totality of conditions at the Ouachita Parish Jail constitutionally deficient pretermits a differentiation between pretrial detainees and convicted prisoners for most of the issues involved in this case. Jail security is the sole justification for

treatment of both classes of prisoner.[39] Consequently, except where noted, our analysis and holdings will apply to both categories of inmates. *Taylor v. Sterrett*, 532 F.2d 462, 470 n.11 (5th Cir. 1976).

*Overcrowding*

■ (12) The two recent Supreme Court cases dealing with overcrowding are factually inapposite to the conditions at Ouachita Parish Jail. In *Bell v. Wolfish*, the court described the Metropolitan Correctional Center, the facility in question, as follows:

> The MCC differs markedly from the familiar image of a jail; there are no barred cells, dank, colorless corridors, or clanging steel gates. [Constructed in 1975,] [i]t was intended to include the most advanced and innovative features of modern design of detention facilities. As the Court of Appeals stated: "[I]t represented the architectural embodiment of the best and most progressive penological planning." [*Wolfish v. Levi*] 573 F.2d at [118] 121. The key design element of the 12–story structure is the "modular" or "unit" concept, whereby each floor designed to house inmates has one or two largely self-contained residential units that replace the traditional cellblock jail construction. Each unit in turn has several clusters or corridors of private rooms or dormitories radiating from a central 2-story "multipurpose" or common room, to which each inmate has free access approximately 16 hours a day.

441 U.S. at 525, 99 S.Ct. at 1866–67. Most of the inmates at MCC spent less than thirty (30) days at the facility. (One female prisoner at Ouachita Parish Jail was serving a five year sentence.) The jail in *Rhodes v. Chapman* was constructed in 1970 with gymnasium, workshops, schoolrooms, "dayrooms", barbershop and library. The district court described this physical plant as "unquestionably a top-flight, first-class facility." 101 S.Ct. at 2395. The Ouachita Parish Jail stands in stark contrast.

■ (13) This court has found the jail grossly overcrowded. This overcrowding affects the mental and emotional well-being of the prisoner as well as increasing the threat to personal security. Failure to provide adequate living space to convicted persons constitutes cruel and unusual punishment. *Gates v. Collier, supra; Newman v. State of Alabama*, 349 F.Supp. 278 (M.D. Ala.1972), *aff'd in part*, 503 F.2d 1320 (5th Cir. 1974), *cert. denied*, 421 U.S. 948, 95 S.Ct. 1680, 44 L.Ed.2d 102 (1975); *Adams v. Mathis*, 458 F.Supp. 302, 308 (M.D.Ala.1978), *aff'd* 614 F.2d 42 (5th Cir. 1979); *Ramos v. Lamm*, 485 F.Supp. 122 (D.Colo.1979), *modified*, 639 F.2d 559 (10th Cir. 1980), *cert. denied*, 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 239 (1981).

■ (14) The failure to provide a pretrial detainee with an environment that does not impair his mental and emotional health is punishment and violative of his Fourteenth Amendment rights. *Anderson v. Nosser*, 456 F.2d 835 (5th Cir.) (*en banc*), *cert. denied*, 409 U.S. 848, 93 S.Ct. 53, 34 L.Ed.2d 89 (1972); *Adams v. Mathis, supra.*

(15) Mindful of the mandate of *Bell v. Wolfish*, this court will set no space standards but a maximum number to be incarcerated will be established, except for brief periods upon the proper showing of grave public emergency. *Jones v. Diamond, supra.* In determining this maximum number the court considered the total square footage, the maze-like layout of the physical plant, the amount of hours spent in the cell by each inmate, the lack of meaningful diversions such as library, dayroom and extended exercise. The court also evaluated the testimony of the various experts and the standards promulgated by the State Fire Marshal before arriving at the consensus that 60 square feet per inmate was the ideal space requirement.[40]

(16) "A district court has the power to order an end to the operations of a penal

---

39. The defendants also assert "a lack of funds defense." The efficacy of this defense to a constitutional violation will be discussed *infra*.

40. As noted earlier, the various standards set forth in plaintiffs' Exhibits 18–22 and the testimony of the experts are goals not the constitutional minima. *See Bell v. Wolfish.*

facility (or to condition its continued operations on a reduction in population) when it is so overcrowded as to violate the law." *Miller v. Carson, supra,* at 751 n.14. *See also Williams v. Edwards, supra.* The population at Ouachita Parish Jail shall not exceed 90 inmates.

*Inadequate Supervision*

(17) "Confinement in a prison where terror reigns is cruel and unusual punishment. A prisoner has a right to be protected from the constant threat of violence and from sexual assault." *Jones v. Diamond* at 1373. *Accord, Williams v. Edwards,* at 1214; *Gates v. Collier* at 1309. Extreme overcrowding is a natural concomitant of inadequate public support for jails. Incidents in the jailer's daily log,[41] the high incidence of attempted suicides and prisoner violence [42] and the reported acts of homosexual rape clearly demonstrate that the jail population is inadequately supervised. The compartmentalized floor plan of the jail exacerbates this problem.

(18) Failure to provide adequate jail personnel to ensure prisoner safety at the Ouachita Parish Jail violates the inmates' Eighth and Fourteenth Amendment rights. *Williams v. Edwards, supra; McCray v. Sullivan,* 509 F.2d 1332 (5th Cir.), *cert. denied,* 423 U.S. 859, 96 S.Ct. 114, 46 L.Ed.2d 86 (1975); *Nicholson v. Choctaw County Alabama,* 498 F.Supp. 295 (S.D.Ala.1980). The evidence established that the number of guards was insufficient. This problem will be eased by the reduction in jail population and by better training. The addition of a matron and removing all booking duties from the jailers will further improve the problem. The jail should have four guards plus the supervisor on the day shift regardless of the day of the week. Three guards should be on duty during the evening and night shift regardless of the day. The patrols shall be on a random, non-scheduled basis at an average of 15–minute intervals. The pretrial detainees should receive more frequent monitoring if necessary.

(19) The most alarming item concerning jail supervision is the absence of any system for the prisoner to summon a guard: banging on the bars is too archaic to deserve discussion. The court adopts the suggestion of Ms. Sulzer that a light/intercom system similar to those used in hospitals would be feasible. Latitude will be accorded the jail officials in creating a communication system as long as the mechanism will provide for prompt summoning of officials in time of distress. *See Smith v. Sullivan,* 553 F.2d 373, 380 (5th Cir. 1977).

*First Amendment Rights*

(20) In discussing prison conditions that impinge on a prisoner's First Amendment rights, the Supreme Court repeated the well-settled principle that lawful incarceration, whether of a pretrial detainee or a convicted prisoner, is accompanied by a withdrawal of many rights and privileges as justified by considerations underlying the penal system. *Pell v. Procunier,* 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974); *Bell v. Wolfish, supra. Procunier v. Martinez, supra.* But the court went on to establish the parameters of First Amendment curtailment:

> In the First Amendment context a corollary of this principle is that a prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system. Thus, challenges to prison restrictions that are asserted to inhibit First Amendment interests must be analyzed in terms of the legitimate policies and goals of the corrections system, to whose custody and care the prisoner has been committed in accordance with due process of law.

*Pell v. Procunier,* 417 U.S. at 822, 94 S.Ct. at 2804: against this benchmark the court will examine the two First Amendment issues raised by plaintiffs.

---

41. PX 7 and 8.

42. See the inmate medical records introduced as PX–11.

## A. Visitation

(21) Convicted prisoners have no absolute constitutional right to unrestricted visitation. *Lynott v. Henderson*, 610 F.2d 340 (5th Cir. 1980); *Newman v. State of Alabama*, 559 F.2d 283 (5th Cir. 1977), *cert. denied sub nom. Alabama v. Pugh*, 438 U.S. 781, 98 S.Ct. 3057, 57 L.Ed.2d 1114 (1978). For convicted prisoners, visitation privileges are a matter subject to the discretion of prison officials. *McCray v. Sullivan*, 509 F.2d 1332 (5th Cir.), *cert. denied*, 423 U.S. 859, 96 S.Ct. 114, 46 L.Ed.2d 86 (1975). However, basic visitation is a right protected by the First Amendment: freedom of association. Infringement of a valid First Amendment right cannot be arbitrarily imposed. The limitation must meet a legitimate penological objective such as rehabilitation or internal security. *Bell v. Wolfish, supra; cf., Jones v. North Carolina Prisoners' Labor Union*, 433 U.S. 119, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977). Further, the court must scrutinize the proposed justification to ensure that the visitation practice actually furthers the objectives. *Lynott v. Henderson, supra; Rudolph v. Locke*, 594 F.2d 1076 (5th Cir. 1979).

(22) Dr. Ware found the visitation facilities to be the most shocking aspect of the Ouachita Parish Jail. Lack of privacy, inability to talk and maintain visual contact and the limited scheduling rendered effective visitation impossible. Defendants did not assign a legitimate justification to these antiquated visitation facilities. Lack of funds is inferred but patently irrelevant. The court has found that the current visitation procedures are constitutionally deficient. Defendants must allow open visitation or construct modern visitation booths with clear eye level partitions and an effective device for vocal communication. The booths should also provide privacy. The visiting hours shall be sufficient for each inmate who so desires to have thirty (30) minutes of visitation once a week. The visiting hours should be scheduled at a time accessible to working family members and friends.

(23) The regulations for Ouachita Parish Jail do not allow children under 14 in the jail at any time.[43] This includes visitation of incarcerated family members. The only justification advanced for this restriction was given by Sheriff Grant: children of that age should not see their parents in a jail environment. Besides being totally refuted by the testimony of Dr. Paul Ware, this justification is not one of the valid penological objectives identified by any court. Prison officials must tread carefully when restricting family visitation. Family interests like any First Amendment right can only be limited by restrictions which are not unnecessarily broad and only to further important governmental interests. *Moore v. City of East Cleveland, Ohio*, 431 U.S. 494, 499, 97 S.Ct. 1932, 1935–36, 52 L.Ed.2d 531 (1977). Most courts have held such restrictions on visitation to particularly close scrutiny:

> Restrictions on visitation are particularly critical since they may prevent inmates from maintaining meaningful family bonds and community ties which promote rehabilitation and successful return to society.

*Ramos v. Lamm*, 485 F.Supp. 122, 161 (D.Colo.1979), *modified* 639 F.2d 559 (10th Cir. 1980), *cert. denied*, 450, 1041, 101 S.Ct. 1759, 68 L.Ed.2d 239 (1981). *Accord, Pugh v. Locke*, 406 F.Supp. 318, 334 (M.D.Ala. 1976), *aff'd sub nom. Newman v. Alabama*, 559 F.2d 283 (5th Cir. 1977), *cert. denied*, 438 U.S. 915, 98 S.Ct. 3144, 57 L.Ed.2d 1160 (1978). Statements from the treatises and studies on prisons introduced into evidence by plaintiffs enforce the importance of visitation in reducing tension inside the prison and in aiding in the ultimate rehabilitation of the inmate.[44] The prohibition on visitation by children is an impermissible impingement on the prisoner's First Amendment right and not justified by any valid

---

43. PX 1.

44. *See* PX–18, A.C.A., *Manual of Standards for Adult Correctional Institutions*, §§ 4210, 4305, 4351 (1977).

penological objective. Accordingly, it must be abolished.

■■■ (24) Contact visitation for convicted prisoners is a matter within the discretion of the prison officials. *Miller v. Carson, supra; McCray v. Sullivan, supra.* Defendants have prohibited contact visitation at Ouachita Parish Jail for security reasons. Contraband could be smuggled into the facility. This restriction was approved by defendants' expert, Ms. Sulzer. Since convicted prisoners should be accorded visitation rights subject to reasonable security requirements, there is no constitutional deprivation in denying contact visitation to convicted prisoners at Ouachita Parish Jail.

■■■ (25) "Pretrial detainees have the right to such reasonable visitation as is commensurate with jail security." *Nicholson v. Choctaw County Alabama* at 310. The abolished visitation restrictions on convicted·prisoners obviously apply to pretrial detainees.[45] The matter of contact visitation is more troublesome. The issue has vexed the courts and remains an unsettled issue in the Fifth Circuit.[46] The Supreme Court considered the right of pretrial detainees to contact visitation and held that physical contact may be denied if the restraint is "reasonably related to the institution's interest in maintaining jail security." *Bell v. Wolfish,* 441 U.S. at 539, 99 S.Ct. at 1874. The physical plant and accompanying security requirements must be examined for the individual facility. *Jones v. Diamond* at 1377.

(26) This court has considered the vagaries of this physical facility with its maze-like floor plan. The jail is located on top of the courthouse with limited space for expansion and remodeling. The facility houses both convicted prisoners and pretrial detainees. The structure of the cells and visitation booths would made it difficult to segregate the two groups of prisoners for visitation purposes. Likewise, some pretrial detainees will not be proper candidates for contact visitation; the facility and small staff would not be able to handle contact visitation with these three classifications. The court finds that denial of contact visitation to pretrial detainees at Ouachita Parish Jail is in response to a legitimate security concern. Monitoring the visitation for possible contraband would overtax the current staff and facility.

### B. *Censorship*

■■■ (27) Censorship of prisoner reading material such as the *Life* magazine introduced into evidence as Plaintiff Exhibit No. 5 infringes on the First Amendment rights of the inmates of Ouachita Parish Jail. The jail has no guidelines for censorship and the censor's decision is not reviewed by a neutral party. In *Procunier v. Martinez,* the Supreme Court addressed the censorship issue and held that the censorship was justified only if the regulations furthered an important or substantial governmental interest unrelated to the suppression of expression. Further, the limitation of the First Amendment right can be no greater than generally necessary or essential to protect the governmental interests involved: security of institution and rehabilitation of inmates. This standard has been adopted by the Fifth Circuit in cases dealing with censorship of periodicals coming into a prison. *See, e.g., Blue v. Hogan,* 553 F.2d 960 (5th Cir. 1977); *Guajardo v. Estelle,* 580 F.2d 748 (5th Cir. 1978).

■■■ (28) In the instant case, the censorship has not been justified by any governmental interest. Implicit in the defendants' defense was the intent to screen sexually explicit material. The rationale behind the censorship was never articulated. Dr. Ware testified such material would have no adverse effects on prisoner safety or morale. The absence of guidelines and any review also violated the Supreme Court's mandate that any invasion of the prisoner's First

---

45. "Pretrial detainees have the right to reasonable visitation from their children." *Nicholson v. Choctaw County, Alabama,* 498 F.Supp. 295, 310 (S.D.Ala.1980).

46. *Jones v. Diamond,* 636 F.2d 1364, 1377 (5th Cir. 1981) (*en banc*). In *Miller v. Carson,* 563 F.2d 741, 749 (5th Cir. 1977), the court allowed contact visitation for detainees.

766

Amendment rights must be accompanied by minimum procedural safeguards. *Procunier v. Martinez, supra; Guajardo v. Estelle, supra.* The defendants' periodical censorship is an arbitrary intrusion on valid First Amendment rights of the inmates. The censorship must cease until guidelines are adopted and approved by the parties.

### Access to the Courts

 (29) It is a well settled principle that prisoners have a constitutional right to meaningful access to the courts and that states have an affirmative obligation to assure such access. *Bounds v. Smith*, 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1971); *Wolf v. McDonnell, supra; Gilmore v. Lynch*, 319 F.Supp. 105 (N.D.Cal.1970), *aff'd sub nom. Younger v. Gilmore*, 404 U.S. 15, 92 S.Ct. 250, 30 L.Ed.2d 142 (1971) (per curiam). As the Supreme Court stated in *Bounds v. Smith*:

> [T]he fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law.

430 U.S. at 828, 97 S.Ct. 1498. In the Fifth Circuit, this access to the courts has been accorded special protection. *Taylor v. Sterrett*, 532 F.2d 462 (5th Cir. 1976); *McCray v. Sullivan*, 509 F.2d 1332 (5th Cir. 1975); *Eisenhardt v. Britton*, 478 F.2d 855 (5th Cir. 1973). Since *Johnson v. Avery*, 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969), the courts have required officials to provide state prisoners with a reasonable alternative providing access to the courts.

(30) In *Cruz v. Hauck*, 515 F.2d 322 (5th Cir. 1975), *cert. denied*, 424 U.S. 917, 96 S.Ct. 1118, 47 L.Ed.2d 322 (1976), the court pointed out that this access may be by providing legal materials or access to counsel. "The fundament underlying the right of access to legal materials is a right of access to the courts. This is the lodestar which guides our course. Access to legal materials is but one source, albeit, an important one, providing an adequate path-

way to the courts." *Cruz* at 331. This theme was approved by the Supreme Court in *Bounds v. Smith*:

> It should be noted that while adequate law libraries are one constitutionally accepted method to assure meaningful access to the courts, our decision ... does not foreclose alternative means to achieve that goal.

430 U.S. at 828, 97 S.Ct. at 1499. The avenue which the state chooses to provide to the prisoner is not important as long as it is in compliance with constitutional standards. The key is that "persons in prison, like other individuals, have the right to petition the government for redress of grievances ..." *Cruz v. Beto*, 405 U.S. 319, 321, 92 S.Ct. 1079, 1081 (1972). *See also, Johnson v. Avery, supra*, at 749.

(31) In the present case, this court has found that inmates at the Ouachita Parish Jail were not provided assistance at the initial stage of filing a grievance:

> The findings of fact do not demonstrate that inmates wishing to file either habeas corpus petitions challenging the constitutionality of their incarceration, or civil rights actions challenging the conditions of their confinement have access to counsel. Due process, however, requires "that prisoners be afforded access to the courts in order to challenge unlawful convictions and to seek redress for violations of their constitutional rights." *Procunier v. Martinez*, 416 U.S. 396, 419, 94 S.Ct. 1800, 1814, 40 L.Ed.2d 224 (1974); ...

*Cruz v. Hauck*, 515 F.2d at 332. The testimony of Judge Fudicker unequivocally established that a prisoner did not to have access to legal counsel until he had filed some type of pleading. Lack of any mechanism to ensure a prisoner assistance at the initial stage of filing a grievance is a direct violation of due process. *Procunier v. Martinez, supra.*

 (32) The parties stipulated that the Ouachita Parish Jail does not have a law library and persons trained in the law are not available to the inmates to assist in preparing petitions. Plaintiff's Exhibit No. 21, *The National Advisory Commission on*

*Criminal Justice Standards and Goals: Report on Correction,* has a chapter on access to the courts. On page 29, the author lists the books a law library should contain.[47] Obviously, a law library would be expensive to purchase and maintain.[48] But it is not required that a penitentiary or jail have a law library if the state should choose some other means of ensuring access. *Ramos v. Lamm, supra,* at 166. The state could provide counsel through its indigent defendant program or by contract with an agency or law school. Such an alternative was investigated at trial through the testimony of Miss Dixie Stout. Whatever alternative the state selects, it will be subject to further approval by this court. At present, it is beyond cavil that the Ouachita Parish Jail does not provide adequate access to the courts for its inmates. Such denial is a clear violation of the prisoner's right of due process: this constitutional deprivation must be corrected. *Procunier v. Martinez, supra; Bounds v. Smith, supra;* and *Younger v. Gilmore.*

### Sex Discrimination

■■■ (33) The parties stipulated that women are treated differently from men at the Ouachita Parish Jail. The evidence at trial fortified this finding. In order for such a gender-based distinction to withstand a constitutional challenge, the state must show that this classification is substantially related to an important governmental objective. *Kirchberg v. Feenstra,* 450 U.S. 455, 101 S.Ct. 1195, 67 L.Ed.2d 428 (1981); *Craig v. Boren,* 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976); *Reed v. Reed,* 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971). In the present case, the state advances a chimerical argument that women must be kept separate from men. Consequently, they cannot be made trustees nor

transferred to the more attractive conditions enjoyed at the farm. This justification is tantamount to no justification— merely a new version of the often repeated "lack of funds" refrain sung by defendants throughout this proceeding. By proper expenditures for modification of facilities and hiring new personnel, the facilities could be integrated. Defendants have failed to advance a substantial and important governmental objective for its disparate treatment of women inmates.

(34) Refusing to transport female inmates from the top of the courthouse to the Parish Prison Farm is an express gender-based discrimination. If defendants had advanced some arguable governmental objective, this court would hold the state to a standard higher than the minimum rationality test of most equal protection violations. "[T]raditional minimum rationality test takes on a somewhat 'sharper focus' when gender-based classifications are challenged." *Michael M. v. Superior Court of Sonoma County,* 450 U.S. 464, 468, 101 S.Ct. 1200, 1204, 67 L.Ed.2d 437 (1981). *See also, Califano v. Webster,* 430 U.S. 313, 97 S.Ct. 1192, 51 L.Ed.2d 360 (1977); *Hogan v. Mississippi University for Women,* 646 F.2d 1116 (5th Cir. 1981). In the context of prison operation, the courts have not hesitated to find violations of equal protection when inmates are treated differently merely by the fortuity of their sex. *See, e.g., Mitchell v. Untreinter* at 895. In *Mitchell v. Untreinter,* the court found a denial of equal protection when female inmates were not allowed to be trustees or enjoy incarceration at the less restrictive County Road Prison. In Plaintiff's Exhibit No. 19, *The National Sheriff's Association Manual on Jail Administration,* the following quotation is taken from the preface, page 3:

---

**47.** The library should include:
 (1) The State constitution and State statutes, state decisions, State procedural rules and decisions thereon, and legal works discussing the foregoing.
 (2) Federal case law materials.
 (3) Court rules and practice treatises.
 (4) One or more legal periodicals to facilitate current research.

**48.** If the State chooses to provide access via a law library, "its contents must be constitutionally adequate." *Ramos v. Lamm,* 485 F.Supp. 122, 166 (D.Colo.1979), *modified,* 639 F.2d 559 (10th Cir. 1980), *cert. denied,* 450 U.S. 1041, 101 S.Ct. 1759 (1981). *See also, Mitchell v. Untreiner,* 421 F.Supp. 886, 68 L.Ed.2d 239 (N.D.Ga.1980).

Nowhere in this handbook is any effort made to distinguish between the sexes, whether they serve as jail administrators, jail employees, or jail inmates.

All standards and principles apply equally to both males and females with only two exceptions, which should be self-evident to all but which perhaps bear restating.

(1) Male and female inmates must be separated by substantial architectural arrangements which permit no visual or oral contacts.

(2) No male employee or visitor will enter the female quarters in the jail unless advance notice is given and escort service provided by female jail supervisors. Where there are women in the jail population, a female supervisor is required to be on duty.

Adequate security arrangements could be made to house female prisoners at the Ouachita Area Multi-Parish Prison Farm. Likewise, with increased security and a matron at the Ouachita Parish Jail, female prisoners should be allowed to perform the functions of trustees such as cleaning, cooking and serving. Although expenditures will be necessary, the alternative is feasible as testified at trial by Warden Scroggy. The current gender-based discrimination at the Ouachita Parish Jail denies female inmates their equal protection under the law as guaranteed by the Fourteenth Amendment to the United States Constitution. Immediate steps must be taken to cure this constitutional deprivation.

*Right to Sheets*

■ (35) Although the jail rules, introduced into evidence as Plaintiff's Exhibit No. 15, state that inmates will be provided sheets, the inmates at the Ouachita Parish Jail have only a mattress cover for bedding. Much time and effort has been spent in litigating this particular deprivation. The sheriff stated that one reason sheets were not provided was lack of money. Other reasons such as security risks, clogging the plumbing, and general clutter to the cell were advanced by various witnesses. Ms. Sulzer stated that inmates were not provided sheets at her institution. Warden Scrog-

gy testified that his inmates did have sheets and no security risk was posed. The court need not enter this melee since it finds no constitutional deprivation in failing to provide inmates with a linen sheet for bedding. Inmates are provided with a mattress cover which consists of a cloth sack. The mattress cover allows the inmates to sleep with a cover on top and a layer of bedding between himself and the mattress. This is no deprivation of basic personal hygiene and no evidence was adduced at trial to support the proposition that deprivation of sheets triggered severe mental or emotional trauma. The Ouachita Parish Jail officials have decided not to provide sheets; this is within their discretion as prison administrators. This ruling applies both to convicted prisoners and pretrial detainees.

■ (36) From the above discussion, this court finds that the conditions at the Ouachita Parish Jail violate the inmates' constitutional rights as guaranteed by the First, Sixth, Eighth, and Fourteenth Amendments to the Constitution. The totality of conditions at the Ouachita Parish Jail constitute cruel and unusual punishment as to the convicted inmates and amounts to denial of due process as to the pretrial detainees.

### III.

*Lack of Resources Not a Justification For Deprivation of Constitutional Rights*

■ As in most institutional litigation, the state laments that it does not possess sufficient funds to correct obvious constitutional deprivations. "Where state institutions have been operating under unconstitutional conditions and practices, the defenses of fund shortage and the inability of the district court to order appropriations by the state legislature, have been rejected by the federal courts." *Gates v. Collier*, 501 F.2d 1291, 319 (5th Cir. 1974). The decision of the Ouachita Parish Police Jury to withhold resources from the Parish Jail is no adequate justification for depriving inmates of their constitutional rights. *Miller v. Carson*, 563 F.2d 741, 747 (5th Cir. 1977); *Smith*

*v. Sullivan*, 611 F.2d 1039 (5th Cir. 1980); *Mitchell v. Untreiner, supra.* This court recognizes that some of the improvements awarded will be costly. Certainly, the $4.00 budgeted to the Sheriff by the Police Jury for each inmate per day will no longer be adequate.[49] Finding clear violations of the prisoners' constitutional rights, the scope of this district court's equitable power will be to remedy past wrongs. Although funding will be a consideration, it is not decisive. *Williams v. Edwards* at 1212; *Nicholson v. Choctaw County Alabama* at 311; *Smith v. Sullivan*, 553 F.2d 373 (5th Cir. 1977).

In fashioning its relief, this court has considered the expense such relief will trigger. In responding to this court's order, the parish may take the most economical alternative as long as it remains a feasible choice of remedies. This court does not intend to become an ombudsman of the parish and sheriff in regard to its jail expenditures. The constitutional wrongs, however, must be remedies and all deprivations cease. Foot-dragging, half-hearted efforts and subterfuge will be regarded as contempt of the court's order accompanied by the appropriate sanctions.

## IV.

### State Defendants

Plaintiffs sued several defendants individually[50] and in their capacities as state officials:

(1) C. Paul Phelps, Secretary of Department of Corrections for the State of Louisiana;

(2) Daniel L. Kelly, Fire Marshal for the State of Louisiana;

(3) Dr. J. T. Hamerick, Director of the Louisiana State Division of Health;

(4) William Cherry, Secretary of Department of Health and Human Resources for the State of Louisiana.

Plaintiffs claim that these defendants have violated their statutory duties concerning the care and conditions of confinement at the Ouachita Parish Jail. Louisiana R.S. 15:763 provides:

Whenever the governing authority of any parish or municipality or the authority in charge of any state prison, lock-up, or camp, shall fail to comply with the provisions of this part, the state health officers shall institute through the Attorney General of the state, or through the District Attorney at the district or in the parish wherein the prison, lock-up or camp is situated, proper legal proceedings to enjoin, restrain and prohibit the parish or municipal governing authority, or the authorities in charge of the state prison or camp from using the prison, lock-up or camp for the purpose of confining prisoners until the provisions of this part have been complied with.

Louisiana R.S. 15:762 directs that no person shall be confined in any jail which is not built or maintained in accordance with the provisions of the statutes. The statutes and concomitant duty were quoted earlier in footnotes 3, 4, 6 and 7.

State defendants assert that the Eleventh Amendment bars any award, either injunctive or monetary against the state. *Edelman v. Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). *Edelman* held that a retroactive monetary award against the state violated the Eleventh Amendment. But the Eleventh Amendment is no bar to an award of attorney's fees against the state in a prison suit. *Hutto v. Finney*, 437 U.S. 678, 98 S.Ct. 2565, 57

---

**49.** The daily allotment per prisoner was $3.50 at the time the suit was filed. The increase to $4.00 occurred on January 1, 1979. Tr. t. Bailey Grant, Sheriff.

**50.** The court dismisses plaintiffs' claims against named individuals since the suit seeks injunctive and declaratory relief. An individual will respond to such relief in his or her capacity as a state official. Each duty listed by plaintiffs in the pretrial order is established by state

law and directed to the office not the individual. Individuals also enjoy a qualified immunity for damages under § 1983. *Procunier v. Navarette*, 434 U.S. 555, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978); *Scheuer v. Rhodes*, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Wood v. Strickland*, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975); *Cruz v. Beto*, 603 F.2d 1178 (5th Cir. 1979).

L.Ed.2d 522 (1978). Further, compliance with an injunctive order of the court may require as an incidental and ancillary consequence the expenditure of state funds. This is not forbidden under *Edelman v. Jordan.* See, *Williams v. Edwards, supra; Gate v. Collier, supra; Newman v. Alabama, supra.*

 Pretermitting a discussion of the exact defenses asserted by the state, and the exact duties allegedly violated, this court finds that plaintiffs did not prove that the state officials breached any duty arising under state law or under the federal constitution. The Secretary of the Department of Corrections, the State Fire Marshal and state health officers have a duty under Louisiana state law to see that the prisoners maintained in parish jails are confined in accordance with the state's statutes. Likewise, the same officials have a duty mandated by the Fourteenth Amendment to the Constitution of the United States to ensure that inmates incarcerated under the laws of Louisiana are not deprived of their constitutional rights. *Pugh v. Locke, supra.* In *Adams v. Mathis*, 458 F.Supp. 302, 309 (M.D.Ala.1978), *aff'd* 614 F.2d 42 (5th Cir. 1980), the court held that the appropriate state officials have the duty of *supervising* the acts of its agents who are authorized by state law to operate a jail in one of its political subdivisions. The district court went on to hold that this constitutional duty to supervise included three basic elements:

> To clearly and specifically define the scope of the authority delegated through the promulgation of detailed rules and regulations; to keep informed as to the conduct of the agents through regular and thorough supervisions; and to take all action necessary to correct the conduct of the agents operating the jails in the political subdivisions, through vigorous enforcement of the established standards and through direct assistance.

*Adams v. Mathis*, at 307. At trial, the plaintiffs did not attempt to establish that the state defendants had directly violated the constitutional rights of the inmates at the Ouachita Parish Jail. Plaintiffs did not carry their burden of persuasion in establishing that the state defendants did not properly supervise the sheriff and police jury, the two defendants cast in judgment. Similarly, the court finds that the plaintiffs did not establish that the state defendants violated any duty arising under the laws of the State of Louisiana. The record shows that the state officials made inspections and recommendations, as required. Accordingly, the state defendants are dismissed from this action. This dismissal does not effect the state's participation in the partial consent decree attached as Appendix A to this opinion. For the purposes of the consent decree, the state shall remain a party to this action and fulfill its obligations under the decree.

## V.

### *Attorneys' Fees*

 The propriety of awarding attorneys' fees in suits filed pursuant to 42 U.S.C. § 1983 was recognized by Congress in the Civil Rights Attorney's Fees Awards Act of 1976, 42 U.S.C., § 1988.[51] In this case, only one of plaintiffs' attorneys was in private practice. The other attorneys and supporting staff were provided by the North Louisiana Legal Assistance Corporation. Regardless, attorney's fees may be awarded to prevailing plaintiffs represented by public interest lawyers. *Nicholson v. Choctaw County Alabama, supra; Clanton v. Allied Chemical Corporation*, 416 F.Supp. 39 (E.D.Va.1976); *Adams v. Mathis, supra.* See also, *Cruz v. Beto*, 603 F.2d 1178 (5th Cir. 1979). The courts do not distinguish between the amount of fees paid to public interest attorneys as compared to private

---

51. 42 U.S.C., § 1988 states:
In any action or proceeding to enforce a provision of [§ 1983 and other statutes] . . . the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs.

counsel.[52] An award of attorney's fees will not be denied simply because the prevailing plaintiffs were represented by a public interest law firm which was separately funded and plaintiffs had no obligation to pay attorneys' fees. *Thompson v. Madison County Board of Education*, 496 F.2d 682, 689 (5th Cir. 1974). *See generally, Schlei & Grossman, Employment Discrimination Law*, p. 344 (1979). The fact that the North Louisiana Legal Assistance Corporation does receive federal funding, will be considered in the computation of an appropriate fee. *Rios v. Enterprise Association of Steamfitters, Local 638*, 400 F.Supp. 993 (S.D.N.Y.1975), *aff'd*, 542 F.2d 579 (2nd Cir. 1976), *cert. denied*, 430 U.S. 911, 97 S.Ct. 1186, 51 L.Ed.2d 588 (1977).

Counsel for plaintiffs in the present suit are entitled to an attorney's fee award under § 1988 for the prosecution of this action. The fees are to be fixed in accordance with the criteria set forth in *Johnson v. Georgia Highways Express, Inc.*, 488 F.2d 714 (5th Cir. 1974). Plaintiffs' representation in this institutional litigation was exemplary. From the filing of the complaint accompanied by 206 carefully drafted interrogatories, to the post-trial arguments, the counsel for plaintiffs displayed skill, diligence and ingenuity of a high degree.

Plaintiffs were able to overcome constant foot-dragging by the defendants in a courteous and professional manner.[53] The plaintiffs' brief on class certification and their post-trial memorandum are high-quality legal work. Plaintiffs attempted to cut costs at every corner: testimony was perpetuated by the less expensive non-stenographic recording procedure allowed by Rule 30(b) of the Federal Rules of Civil Procedure. Defendants' obdurate behavior necessitated some attorney time that could

have been alleviated. For instance, the Sheriff, claiming a specious privilege, refused to produce certain records applicable to inmates. The Sheriff also prohibited plaintiffs' paralegals from interviewing the inmates in connection with the upcoming trial. Eventually, plaintiffs were forced to file a motion for preliminary injunction; after a hearing, the court granted their request citing established case law. Several complete pretrial orders were prepared by the plaintiffs and a detailed questionnaire was distributed to the entire inmate population at the Ouachita Parish Jail to gather facts and statistics relevant to plaintiffs' case.

Although a substantial amount of attorney time on behalf of plaintiffs did not lead to success, the effort should still be rewarded:

> In fixing the fee, the district court should be mindful that in complex civil rights litigation and particularly in prisoners' rights cases, issues are overlapping, and intertwined. In order to represent their clients adequately, attorneys must explore fully every aspect of the case, develop all of the evidence and present it to the court. Time spent in pursuing unsuccessful claims that were clearly without merit should be excluded. However, the mere fact that the litigants did not succeed in obtaining a judgment on all of the claims asserted does not mean that the time spent pursuing these claims should not automatically be disallowed.

*Jones v. Diamond, supra*, at 1382. With these preparatory remarks, the 12 guidelines set forth in *Johnson v. Georgia Highways* will be applied.

(1) *The Time and Labor Required*:

Each of plaintiffs' counsel who at any time worked on this case from its com-

---

52. *Reynolds v. Coomey*, 567 F.2d 1166, 1167, (1st Cir. 1978) (fees awarded on same basis); *Richardson v. Civil Service Commission*, 449 F.Supp. 10, 13 (S.D.N.Y.1978) (no reduction in fees because attorney employed by civil rights organization). *Accord: Torre v. Sachs*, 538 F.2d 10, 11-12 (2d Cir. 1976) (voting rights case; publicly financed legal services attorney entitled to full going rate). *But cf. EEOC v. Steamfitters Local 638*, 542 F.2d 579, 592–93

n.13 (2d Cir. 1976), *cert. denied*, 430 U.S. 911, 97 S.Ct. 1186, 51 L.Ed.2d 588 (1977) (factor of federal funding can be considered in computation of award).

53. Plaintiffs' opposition to defendants' motion for a continuance succinctly documents defendants recalcitrant behavior and plaintiffs' professional response.

mencement to judgment will be required to submit an affidavit reflecting the number of hours spent in pursuit of this litigation. The timesheets of paralegals and other supporting staff should also be submitted in affidavit form. But the court takes note that a large number of hours were expended by counsel for the plaintiff. Ultimately, two attorneys for the North Louisiana Legal Assistance Corporation and one private counsel tried the case. Any duplicity of attorney time during the pendency of the action will be taken into account. The court notes that many hours were involved in the investigation, clerical work and compilation of facts and statistics. The file reflects several scholarly briefs by plaintiffs' counsel and numerous well-tailored discovery interrogatories and request for admissions.

The court differentiates in-court time, research and writing efforts, investigation, interview time and clerical work. The affidavits shall be broken down into these categories. A brief statement as to the attorney overlap should also be submitted. If the defendants controvert the affidavits, a hearing will be held to establish the total number of hours and how the time was spent.

### (2) The Novelty and Difficulty of the Questions:

The court takes note that general constitutional principles regarding the rights of pretrial detainees and convicted prisoners were not well settled at the time of this litigation. On the eve of trial, the Supreme Court had issued *Bell v. Wolfish* and a panel of the Fifth Circuit had recently decided *Jones v. Diamond*. After the trial of this case, the *en banc* decision of *Jones v. Diamond* was rendered. In the Fifth Circuit, and in the Supreme Court, recent pronouncements made the waters for both counsel and the court more difficult to navigate.

Further, this case was extremely complex considering the variety of deprivations existing at the Ouachita Parish Jail at the time suit was filed. Many of the more difficult questions resolved themselves by the parties' consent decree. But both from a factual and legal standpoint, the issues required above average skill to bring to a resolution. The novelty and difficulty of the questions in this case will be taken into account.

### (3) The Skill Requisite to Perform the Legal Services Properly:

As noted earlier, the work product of plaintiffs' attorneys is as good as any previously presented to this court in institutional litigation. The court is especially impressed with the professional and patient manner with which plaintiffs' counsel responded to the sometimes obstinate behavior of defendants. Plaintiffs' complaint was skillfully drafted. Plaintiffs' discovery was written in a way calculated to elicit all relevant data and information in the possession of the defendants. The skillful discovery was directly responsible for the settling of many issues in this matter by the parties' consent decree. Plaintiffs' presentation at trial was crisp and cogent.

### (4) The Preclusion of Other Employment by the Attorney Due to Acceptance of the Case:

While this factor is perhaps more relevant to the private counsel for plaintiff, the North Louisiana Legal Assistance Corporation is often understaffed. By a cursory review of the file, it is evident to this court that substantial time was expended by the plaintiffs' counsel certainly precluding involvement in other matters.

### (5) The Customary Fee:

This court has decided many employment discrimination matters, civil rights cases and school desegregation lawsuits. On numerous occasions, an attorney's fee award has accompanied such a decision. This court will apply the prevailing hourly rate existing in 1979 in the Shreveport-Monroe community.

(6) *Whether the Fee is Fixed or Contingent*:

Since plaintiffs' counsel was initially a public interest law firm, the court assumes there was no fee arrangement involved. If the private attorney had a contract with the plaintiffs, this matter should be brought to the court's attention in his affidavit.

(7) *Time Limitations Imposed by the Client or the Circumstances*:

Considering the egregious conditions existing at the Ouachita Parish Jail at the time the suit was filed and plaintiffs' claim for injunctive relief, the expediency of this lawsuit was a factor. As documented in plaintiffs' opposition to defendants' motion for a continuance which plaintiffs filed on January 18, 1979, plaintiffs diligently pursued this matter to its resolution. Plaintiffs resisted defendants' delay at every stage of the proceeding. Considering the nature of the rights involved, this urgency was most appropriate.

(8) *The Amount Involved and the Results Obtained*:

As evidenced by the partial consent decree attached as Appendix A to this opinion, plaintiffs were successful in obtaining a resolution of many issues short of trial. Except for the insignificant request for bed sheets, plaintiffs have prevailed on every issue involved in this proceeding. No monetary amount is involved, but through injunctive and declaratory relief, plaintiffs have benefitted a large number of individuals incarcerated at the Ouachita Parish Jail.

(9) *The Experience, Reputation and Ability of the Attorneys*:

The court notes that Mr. James Kellogg, the private attorney, is an experienced civil rights attorney who has been before this court on other occasions. The attorneys for the North Louisiana Legal Assistance Corporation have also practiced before this court. By the very nature of their organization, they have experience in many aspects of civil rights litigation. Although the attorneys for the North Louisiana Legal

Assistance Corporation were not greatly experienced in federal litigation, the skill and ability of these attorneys was exemplary. The reputation of all attorneys is beyond reproach and the court does not see the need for a differentiation among the fees of plaintiffs' counsel: the ability of these attorneys is comparable to any lawyer who has practiced before this court.

(10) *The Undesirability of the Case*:

Plaintiffs' counsel undertook a Herculean task not approached by any other attorney. The need for change at the Ouachita Parish Jail was no secret as the Grand Jury reports introduced into evidence clearly demonstrated. Undertaking a complete attack on the conditions of confinement and the deprivation of the prisoners' constitutional rights would be a large task. Plaintiffs' counsel stepped into shoes no one else cared to fill.

The court notes that no opprobrious repercussions have been suffered by plaintiffs' counsel because of their representation in this case. The changes at the Ouachita Parish Jail were needed and recognized by most responsible members of the community. Hopefully, the community will undertake the ordered changes in a spirit of concern and goodwill. Plaintiffs' counsel have suffered no loss of business because of their involvement in this lawsuit.

(11) *The Nature and Length of the Professional Relationship with the Client*:

The court does not find this factor applicable to the present case.

(12) *Awards in Similar Cases*:

As stated previously, this court is no stranger to institutional litigation and has made several attorneys' fee awards to the prevailing plaintiffs. Likewise, this court has reviewed the hourly rates awarded in other prison cases. *See, e.g., Miller v. Carson*, 401 F.Supp. 835 (M.D.Fla.1975), *modified* 563 F.2d 741 (5th Cir. 1977); *Adams v. Mathis*, 458 F.Supp. 302 (M.D.Ala.1978), *aff'd* 614 F.2d 42 (5th Cir. 1979), *Nicholson*

*v. Choctaw County Alabama*, 498 F.Supp. 295 (S.D.Ala.1980). The fact that this case was handled in part by a public interest corporation federally funded will be considered. This factor will not affect plaintiffs' private attorney.

The judgment for attorneys' fees will be assessed against the remaining defendants, Ouachita Parish Police Jury and the Sheriff's Office of Ouachita Parish, *in solido*. This award shall also include an amount for the expert witness fees of Warden Scroggy and Dr. Paul Ware. *See, Jones v. Diamond* at 1382. A statement for the services rendered by the experts should be submitted along with plaintiffs' counsel's affidavits.

### VI.

#### Plan for Distribution of Partial Consent Decree

In accordance with Rule 23(e) of the Federal Rules of Civil Procedure, the compromise arrived at in the form of the partial consent decree attached as Appendix A to this opinion must be approved by the class members. This consent decree was given preliminary approval on February 12, 1979. For implementation of the various deferred provisions, the time began running on May 4, 1979 pursuant to this court's minute entry. This court orders that the notice attached to this opinion as Appendix B is to be signed by the Clerk of Court and distributed to the class members by posting a copy of the notice with consent decree attached at the prison's visitation facilities, telephone booths and dining areas. Copies of the notice and attached partial consent decree shall also be distributed to the inmates of the Ouachita Parish Jail, one copy to every five persons housed in the facility. Defendants shall file a written report concerning the distribution of this notice and consent decree 15 days from this date.

The members of plaintiffs' two subclasses shall have the right to file objections within 30 days of this date. These objections must be in writing and mailed to Honorable Robert H. Shemwell, Clerk, United States District Court, Western District of Louisiana, Post Office Box 106, Shreveport, Louisiana 71166. Each written objection shall refer to the name and number of this case as it appears in the caption of the partial consent decree.

Pursuant to Rule 53 of the Federal Rules of Civil Procedure and 28 U.S.C. § 636(b)(2), United States Magistrate James M. Barton is appointed special master to hear any objections filed by the members of plaintiffs' class. These objections will be heard at a hearing at the Ouachita Parish Jail at a time to be scheduled by the Magistrate. The Magistrate should then report his findings to the court.

### VII.

#### Special Master

Pursuant to Rule 53 of the Federal Rules of Civil Procedure and 28 U.S.C. § 636(b)(2), United States Magistrate James M. Barton is hereby appointed Special Master by this court to monitor the defendants' compliance with the partial consent decree given preliminary approval on February 12, 1979. The Magistrate shall also monitor defendants' compliance with this court's permanent injunction entered this date. Six months from this date, the Magistrate shall investigate defendants' progress in compliance and make a written report of his findings to this court.

### CONCLUSION

"Once a right and a violation have been shown, the scope of the district court's equitable power to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies." *Swann v. Charlotte-Mecklenburg, Board of Education*, 402 U.S. 1, 15, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971). This court is constantly mindful that a federal court should not interject itself into the daily details of jail administration. When drafting an order requiring affirmative relief, the court should achieve minimum intrusion into the details of prison administration. *Gates v. Collier, supra*. But when the constitutional violations are proven, this court is bound to

redress them. "The scope of our authority to correct these conditions is as broad as the violations proven, striving where possible to permit self-determination to prison officials." *Williams v. Edwards*, at 1218. *Accord, Newman v. Alabama*, at 1332. Having found the totality of conditions at the Ouachita Parish Jail violate the constitutional rights of the inmates, this court's remedies are not limited to the specific constitutional deprivation, but must be pervasive within the parameters of judicial restraint shown to jail administrators. *Miller v. Carson*, at 751.

This court has carefully considered the law and the evidence in this matter and in conformance with the above findings of fact and conclusions of law enters a permanent injunction, representing the appropriate relief granted by this court. The court, of course, retains jurisdiction to implement its order if such action is necessitated by the report of the Special Master.

### ORDER

For the reasons assigned in the foregoing Opinion:

IT IS ORDERED, ADJUDGED AND DECREED that defendants, BAILEY GRANT, Sheriff of the Parish of Ouachita; ARLAN E. RAWLS, BILLY BANKS, ROBERT C. DOWNING, A. E. PIERCE, III, WILLIE CRAIN and BILLY F. WHIL-HITE, members of the Ouachita Parish Police Jury, their successors, agents and employees, shall immediately and permanently operate and maintain the Ouachita Parish Jail in compliance with the following:

(1) The number of inmates in the jail shall not exceed ninety (90) on a normal daily basis. No cell or cellblocks shall contain more inmates than the number of bunks available.

(2) In the event that an emergency requires that the inmate population exceed the normal limits as set forth in Paragraph 1, it may not exceed these limits for more than 48 hours and under no circumstances may the population exceed one hundred twenty (120) inmates. Upon a proper showing, this emergency situation may exist for a time period in excess of the 48-hour limitation. When the inmate population exceeds ninety (90) inmates, defendants and plaintiffs' counsel are to be notified, and if necessary, the matter brought to the attention of the court. Defendants are expected to carry out this mandate in good faith and to keep the inmate population from exceeding normal limits of jail capacity.

(3) Beginning January 1, 1982, a quarterly report shall be submitted to this court which includes a general description of the physical plant and any changes, completed or proposed. The report shall also state the number of inmates housed in the Ouachita Parish Jail for each month of the preceding quarter.

(4) Immediate steps shall be taken to hire and train additional correction officers mandated by the foregoing opinion. This number of correctional officers is necessary to supervise properly the inmates of the Ouachita Parish Jail. There shall be at least five (5) correctional officers plus a superintendent on duty during every day shift. There shall be three (3) correctional officers on duty during the evening and night shift of each day.

(5) All personnel at the Ouachita Parish Jail who supervise the inmates shall be adequately and properly trained. Within sixty (60) days from this date, a report shall be submitted to the court setting forth the steps which have been taken with respect to the implementation of a training program for correctional officers. The report shall include a description of the proposed training program.

(6) Within sixty (60) days from this date, a communication system by which the inmates may summon the guards shall be installed in the Ouachita Parish Jail. This system may be in the form of a light/intercom system device provided by the defendants which allows for inmate communication with the guards.

(7) Guard patrols shall take place with an average of fifteen (15) minute intervals on a random, non-scheduled basis.

(8) Open visitation shall be allowed or immediate steps shall be taken to construct adequate visitation booths for the inmates of the Ouachita Parish Jail. The booths shall allow for simultaneous audio-visual contact as well as the privacy of the inmate.

(9) The jail rules shall reflect that visitation is available on a basis sufficient to guarantee that working family members will have an opportunity to visit with the inmates. All limitation on visits by children shall be removed and they shall be allowed visitation as adults. Sixty (60) days from this date, the defendants shall submit a report to this court setting forth what steps have been taken to comply with these requirements or show cause why this order has not been implemented.

(10) In sixty (60) days defendants shall submit a proposed guideline for censorship of prisoner reading material. This guideline shall conform to the principle set forth in *Guajardo v. Estelle*, 580 F.2d 784 (5th Cir. 1978). The defendants shall also provide for a process of review of the censor's decision which meets the minimum standards of due process.

(11) The defendants shall devise a system which furnishes inmates reasonable access to the courts. This access may be furnished by making attorneys available to the inmates on a regular basis or providing a law library. If the alternative of providing legal materials is chosen, the defendants shall submit a list of the books and periodicals to be included in this library.

(12) The defendants shall immediately take steps to allow female prisoners to be incarcerated at the Ouachita Area Multi-Parish Prison Farm. Defendants shall also allow females to be trustees at the Ouachita Parish Jail and the Ouachita Area Multi-Parish Prison Farm. Defendants shall submit a report to this court within sixty (60) days outlining a detailed plan for having women inmates removed to the Ouachita Area Multi-Parish Prison Farm. The defendants will be given six (6) months from this date to make the necessary structural alterations for having female inmates housed at the prison farm.

## APPENDIX "A"

### PROPOSED CONSENT ORDER

The public officials made parties defendant in this litigation, in an effort to improve conditions at the Ouachita Parish Jail, after negotiation with plaintiffs' attorneys, submit this proposal which will at the same time codify existing rules and regulations at the Jail, establish guidelines for certain changes to be instituted, and serve as a model for operation of a new facility when one can be constructed. The public officials have for several years been undertaking a program to improve standards and conditions at the existing old jail, and it is recognized that these conditions have been in some ways less than ideal. Plans and surveys, including land acquisition, for a new penal facility have been underway since early 1974, while the continuing renovation program for the current facility has been on-going for the past fifteen years.

The proposal submitted herewith will codify the program which is being implemented at this time by the Sheriff of Ouachita Parish, the Ouachita Parish Police Jury, and the State of Louisiana. However, it is to be noted that the first priority is the construction of a new penal facility. In spite of lengthy efforts by the Parish officials to obtain Federal assistance for the construction of this facility, it has now become apparent that such Federal funds are not available, and it will be necessary to approach the matter through the calling of a bond election to be presented to the voters of Ouachita Parish.

Because much of the relief described herein is prospective in nature and because much of the relief involves the submitting of plans by various public officials, the Court will maintain jurisdiction of this case until such time as the parties agree or the Court is satisfied that the terms of this Proposed Consent Order and the various plans to be implemented have been complied with. Any dispute which may arise during the implementation of this Order will be submitted by the parties to the

Court for final resolution. Hereinbelow are the specific programs which are proposed to be implemented in the times shown under each heading.

## I.

## CONSTRUCTION OF A NEW FACILITY

1. In April, 1979, the Police Jury will call a bond election for the purpose of providing funds to construct a new Ouachita Parish Jail.

2. In the event the bond election is approved by the voters of Ouachita Parish, the Ouachita Parish Police Jury will authorize its architect to proceed with construction plans and specifications for the purpose of taking bids on the new penal facility. Said architect will be directed to consult with a person or persons expert in Federal prison standards and corrections and the Police Jury will submit the credentials of the consultant chosen by the architect to the Court for Court approval of the consultant. The consultant will assist the architect in the design and specifications of said penal facility and in particular with an eye to incorporating specific changes mentioned in this Consent Decree.

3. In the event the bond election is approved by the voters of Ouachita Parish, the public officials of Ouachita Parish shall use their good offices and shall do whatever is necessary to plan and let for bids and construct the new facility.

4. In the event the bond election is approved by the voters of Ouachita Parish, the plans and specifications for the new Ouachita Parish Jail will be submitted as early as they become available, to all parties and to the Court for approval by the Court. Recommendations by the parties or the Court will be submitted to the Ouachita Parish Police Jury, Parish Manager, within thirty (30) days after the plans and specifications have been delivered to the parties and to the Court. The Ouachita Parish Police Jury reserves the right to reject any recommendations made by the parties or the Court in the construction of the new facility.

5. In the event the new jail complex is built, the old jail will cease to be the primary jail for the Parish of Ouachita.

## II.

## MEDICAL CARE

Within sixty (60) days after approval of this Order, or within such other times as specifically stated, the following program of medical care will be in operation at the Ouachita Parish Jail (as used herein, the term "Medical Personnel" includes the Jail physician, the registered nurse, and the licensed practical nurses):

A. 1. A licensed physician shall be present and available to treat inmates at the Ouachita Parish Jail three (3) times per week on regularly scheduled days and hours, which schedule shall be posted at such points around the Jail as to be available to inmates for inspection. Should the physician be unable to meet a scheduled sick-call day, an alternate day shall be scheduled.

2. A registered nurse shall be employed not less than five (5) hours per day on weekdays to give and prepare medications prescribed by the physician, make the initial physical examination of the inmates described below, and conduct sick call on days and at times that the physician is not present.

3. All prescriptions written by the physician will be filled or refilled, as prescribed, within twenty-four (24) hours, with a record kept of the date the medication was prescribed and the date the prescription was filled. Drugs and treatment prescribed by the physician will be at the expense of the Parish and will be administered by medical personnel during their working hours. Drugs will be administered as prescribed, and a record of the dispensation made by the person administering the drugs, and initialed by the inmate.

4. Inmates for whom special diets are ordered by the physician shall receive the same.

5. There shall be provided a place for sick call that is reasonably private and sanitary, and equipped and stocked with an examining table, a Dazor light, a scale, a wall-mounted ostoscope-opthalmoscope, a wall-mounted blood pressure cuff, an oxygen tank with regulator and mask, and necessary instruments, medications, and record-keeping materials. Regular sick call shall be held daily except on Saturday, Sunday, and holidays.

6. There shall always be one guard on duty who has had training in first aid.

7. Within 180 days, there will be a licensed practical nurse on duty in the Jail at all times except when the registered nurse is on duty, which licensed practical nurse shall also act as a matron guard. The registered nurse or licensed practical nurse, in making rounds to administer medications, shall visit each cell area and collect written or verbal requests from inmates for attention, recording the same in a separate record, and making up the sick-call list. Any inmate making a request for medical care shall be seen by medical personnel within 24 hours. Emergency requests shall be handled as described below. A licensed practical nurse who is also a matron guard will deliver all requests for medical treatment to the registered nurse. In the event the licensed practical nurse or any jailer gives medical assistance to an inmate who has requested medical care, the request will be delivered to the registered nurse or doctor whether or not the jailer or practical nurse feels that the medical problem has been corrected by temporary medical assistance given by the jailer or licensed practical nurse. In the event the inmate still wishes to see the physician after the temporary medical assistance has been rendered, a report of the temporary medical assistance will be made by the jailer or licensed practical nurse rendering such assistance to the registered nurse or physician. It is the intent of this article to allow the licensed practical nurse to render temporary medical assistance reserving, however, to the registered nurse the decision whether an inmate should be seen by the physician.

8. Jail personnel will within sixteen (16) hours of admission to the penal facility take from each new inmate an intake interview which shall include the following: (a) a question as to whether the inmate is presently suffering from any illness; (b) a question as to whether the inmate has any contagious disease; (c) a question as to whether the inmate has any allergies; (d) a question as to whether the inmate is taking any medication. A written record of each response shall be made by the person taking said interview and the inmate will be required to initial the form used. In the event the inmate refuses to so initial, a notation shall be made of his refusal. Standing orders by the physician will permit restarting of medication for any new inmate who reports that he is taking insulin, Dilantin, Phenobarbital, or cardiac medication until he can be seen by the doctor.

9. Within sixty (60) hours of admission but not normally within the first 24 hours of admission, a physical examination of the admitted inmates will be prepared by the registered nurse or the physician.

10. EMERGENCY CARE—When any jailer, while making a routine round or otherwise, is advised by an inmate that the inmate is in immediate need of medical care, or when such immediate need is observed by the jailer, the jailer shall immediately summon the LPN or jailer with first aid training on duty, by radio, and the same shall come immediately to the cell where said inmate is confined. The jailer with first aid training or LPN shall evaluate the situation in accordance with written criteria provided by the physician and distributed to all jailers and medical personnel, and if any emergency condition is found to exist, the inmate will immediately be taken to the physician or nurse in that order, if on duty. If they are not on duty, the inmate will be immediately transported to E.A. Conway Memorial Hospital Emergency Room with transportation provided by the Sheriff's Deputies. In any case in which a request for emergency medical treatment is made, a record thereof, along with the determination of the LPN or jailer with first aid

training on duty, shall be made and preserved in the shift log book or other record provided for that purpose. In all cases in which any doubt exists in the mind of the LPN or jailer with first aid training on duty as to whether a medical emergency does exist, such doubt will be resolved in favor of an affirmative determination.

11. The written criteria referred to in the previous section will be prepared by the jail physician and submitted by the Sheriff to the Court, with copies to all attorneys, within thirty (30) days of approval hereof.

12. PSYCHIATRIC AND CLINIC CARE—Upon recommendation of the physician, medical personnel shall arrange an appointment for any inmate in need of it, at the Mental Health Center or the special unit or any of the clinics at the E.A. Conway Memorial Hospital. Transportation to the appointment shall be provided by the Sheriff's Deputies. In the event an inmate indicates he has an appointment at any other, more remote facility, the physician shall contact said facility to determine whether the need for the inmate's keeping the appointment constitutes an emergency. If so, transportation to the appointment shall be provided by the Sheriff's Deputies. A written record of the Sheriff's inquiry and the responses shall be maintained.

13. No inmate shall be permitted to enter the facility who appears to be mentally ill, based on objective criteria to be prepared by the jail physician, and distributed to all jailers, unless that inmate is immediately housed separately from the rest of the inmate population and steps are taken to secure examination by the physician within 24 hours with regard to such mental illness to determine whether further steps are necessary regarding his or her custodial housing. Further, with regard to any inmate who appears to have become mentally ill, the jail physician shall take immediate steps to follow the provisions of the mental health laws of the State of Louisiana regarding commitment procedures should he deem so advisable.

14. DENTAL CARE—The Police Jury shall arrange to provide, at Parish expense, dental care for immediate problems only, which shall include fillings where needed and any dental work recommended by the jail physician for reasons of health. The Sheriff and Police Jury shall within sixty (60) days from approval hereof submit to the Court and to plaintiff's counsel a plan for providing such dental care. Appointments with the dentist will be arranged by medical personnel and transportation will continue to be provided by the Sheriff's Deputies.

15. The Sheriff of Ouachita Parish will within sixty (60) days prepare a plan to allow inmates to participate in alcohol and drug abuse programs within the confines of the Ouachita Parish Jail.

16. In the event an inmate is in need of restraining to prevent harm to himself or others, the jailer may use whatever restraint is necessary to restrain the inmate, taking care to avoid injury to the inmate. In the event restraints are used, a physician will be notified of the inmate's condition immediately and his orders concerning continuing or discontinuing restraints will be followed.

### III.

### HOUSING

1. The Louisiana State Fire Marshal shall inspect the Ouachita Parish Jail not less than once every six months. In the event that violations of State laws or regulations of the Fire Marshal's office are discovered which violations are inconsistent with this Consent Decree, the Louisiana State Fire Marshal shall give written notice of said violations to the Sheriff of Ouachita Parish, the Ouachita Parish Police Jury, to counsel for all parties and with copies to the Court. The Sheriff of Ouachita Parish and Ouachita Parish Police Jury shall be allowed a period of thirty (30) days to correct the violations found which period may be extended by the Court for good cause shown. In the event the State Fire Marshal's office is of the opinion that the violations are not corrected within the delays allowed, the

matter shall be turned over to the legal department of the Office of Fire Protection for handling in accordance with the Fire Marshal's procedures and regulations.

2. Within thirty days of approval of this Consent Order, the Sheriff in consultation with an expert approved by the Court, and the Ouachita Parish Police Jury in consultation with the State Fire Marshal's office, shall submit a plan which shall:

(a) insure adequate fire protection for the inmates of the Ouachita Parish Jail;

(b) provide an efficient and adequate method of emergency evacuation of the Ouachita Parish Jail.

Specific guidelines for the emergency evacuation of the Ouachita Parish Jail will be posted in each cell although for security reasons, emergency exits will not be contained therein.

3. All prison personnel shall be periodically tested on their knowledge of the emergency evacuation plans.

4. The Ouachita Parish Police Jury has received two air packs (personal breathing apparatus) to be used by jailers in the event of fire or smoke. All jailers will be trained in the use of these devices by persons qualified to train in the use of these devices. The Ouachita Parish Police Jury will issue purchase orders for smoke alarms to protect cells and cell blocks and will provide same to the Sheriff of Ouachita Parish immediately upon their receipt. These devices will be installed and used in accordance with the recommendations of the State Fire Marshal and all jailers will be trained in their use.

5. The Sheriff and the Police Jury shall continue to have inspections by the Louisiana Division of Health. The jail kitchen will be inspected every month and the entire jail will be inspected every three months. Except as provided in this Consent Decree, any discrepancies shall be corrected within sixty (60) days after being noted. Copies of the reports of inspection shall be submitted to the Court and to all counsel.

6. The Sheriff of Ouachita Parish shall, within sixty (60) days from the date of the approval of this Consent Decree, formulate and implement a plan of classification for housing inmates, using objective and non-racial criteria. The plan shall include the form to be used for the intake and classification interview referred to in paragraph II–8 and paragraph XIII–1. The plan for such classification shall be submitted to the Court and plaintiff's counsel and shall be based on the following criteria, among others:

(a) all persons who are pre-trial detainees shall be segregated from convicted inmates;

(b) inmates shall be housed separately by sex, but not by race;

(c) within the group of sentenced inmates those inmates serving sentences of five years or less shall be segregated from those serving sentences of more than five years or who are multiple offenders;

(d) persons who are susceptible to physical abuses including sex offenders, state witnesses, persons who are mentally retarded or those persons vulnerable to sexual attacks will be housed separately from other inmates;

(e) persons found by the jail physician to be suffering from a communicable health problem posing a threat to other inmates will be housed separately from other inmates.

7. The Sheriff and the Police Jury shall continue to employ a program of pest control which shall be subject to inspection and approval during the regular inspection of the Louisiana Division of Health. All broken windows shall be reported on the inspection reports and shall be repaired within fifteen (15) days of notice to the Ouachita Parish Police Jury. The Sheriff of the Parish of Ouachita will instruct all jailers to keep all windows closed at all times and to report any broken windows to the Ouachita Parish Police Jury Manager.

8. The Sheriff will continue to provide mattresses to inmates which are of a type which do not give off toxic fumes when subject to high temperatures.

## IV.
## HYGIENE

Within ten (10) days after approval hereof:

1. Each inmate shall be issued soap. Women inmates will be provided sanitary napkins and all toilets shall be kept supplied at all times with toilet paper.
2. Each indigent inmate shall be issued soap, toothpaste, toothbrush, shaving razor and shaving cream. Shaving powder will be made available as an alternate to those inmates who prefer it.
3. All inmates shall continue to be provided with two sets of institutional clothing, consisting of coveralls for men and jail dresses for women. Each inmate may retain one set of civilian clothing in the cell until after sentencing, after which only institutional clothing will be allowed. Indigent inmates will be provided with two sets of underwear.
4. Each inmate shall be issued a plastic-covered mattress, a clean cotton two-layered mattress cover, a clean blanket, and two clean bath towels. The mattress cover, towels, and institutional clothing shall continue to be laundered once a week, and the blanket once a month.
5. Shower facilities with hot and cold water shall continue to be made available to all inmates on a daily basis. Because showers are known to lend themselves for use as places of inmate abuse upon other inmates, shower curtains shall not be used in the present facility.

## V.
## STORE ORDERS

Inmates will be allowed store orders once a week with a $10.00 maximum on store orders. The $10.00 may be used to purchase any items carried in the store. Inmates will not be provided any funds for the purchase of store orders by any of the parties to this Consent Decree.

## VI.
## DIET

1. The Sheriff shall continue to have each weekly menu approved and initialed by the dietician at E.A. Conway Memorial Hospital, and to serve each inmate three meals per day, in accordance with the approved menus, which meet or exceed all of the U.S.D.A. Minimum Daily Requirements for adults.
2. Milk, juice, tea, coffee or fortified liquid substitute shall be provided with each meal.
3. All foods shall be prepared and served in compliance with the Sanitary Code of the State of Louisiana.
4. All food handlers, before embarking upon any duties, shall be successfully subjected to a tuberculosis skin test and shall obtain a health certificate from the Ouachita Parish Health Unit.

## VII.
## JAIL RULES AND PUNISHMENT

1. Within ninety (90) days after approval hereof, the Sheriff shall prepare and submit to the Court for approval, with copy to all counsel, a set of written rules to govern inmate behavior and disciplinary action which shall be given to each inmate upon admission to the Ouachita Parish Jail. These rules shall, among other things: (a) specify what offenses are punishable within the jail and the range of punishment of each; (b) define what articles constitute contraband; (c) provide for mail rules; (d) set the method to be employed for disciplinary hearings for serious offenses, which hearing must be held by someone other than the accusing officer before punishment is meted

out (except in emergencies), and further sets the method for an appeals procedure; (e) punishment shall be imposed by someone other than the accusing officer; (f) punishment shall not be applied to an entire cell unless the alleged offense for which punishment is to be imposed was committed by the entire cell. A disciplinary hearing for each inmate will be held prior to an entire cell being punished.

2. It has always been Sheriff Bailey Grant's policy that corporal punishment is not to be employed as a method of punishment in the Ouachita Parish Jail, nor will it ever be employed as a method of punishment.

## VIII.

### MAIL AND COMMUNICATIONS

1. Outgoing mail shall not be opened, censored or limited in any manner.

2. Incoming mail, other than privileged mail, may be opened by jail personnel and inspected for contraband only. Mail shall not be read.

3. Incoming mail from courts, attorneys or members of their staff, including paralegals, government agencies and officials, the media, and probation or parole officers shall be considered as privileged and may be opened and inspected for contraband only in the presence of the inmate to whom the communication is addressed and immediately turned over to the inmate without being read by jail officials.

4. Jail officials will not use a card authorizing them to open all inmate mail.

5. Within fifteen (15) days of approval hereof, postage stamps shall be available for sale at cost to inmates on a daily basis and shall be provided free to inmates who cannot afford to purchase them.

6. Each inmate, upon admission to the jail, shall be issued two envelopes and two blank sheets of paper. Pens or pencils shall be made available to inmates who need them.

7. Inmates will be allowed to keep personal photographs of their family and friends on their person, or in their cell, but will not be allowed to display same in any of the jail areas, including their cells.

## IX.

### RELIGION

1. The Sheriff of Ouachita Parish has addressed letters to the Monroe Ministerial Alliance and the Ouachita Council of Churches requesting assistance in the formulation of a plan to provide religious services for inmates in the Ouachita Parish Prison. Within sixty (60) days of the date of the signing of this Consent Decree the Sheriff will, in consultation with the Monroe Ministerial Alliance and the Ouachita Council of Churches formulate a plan for religious services for recognized religious groups provided that a minimum of five (5) inmates request this religious service.

2. Inmates will be allowed to counsel with the religious ministers individually between 8:00 a.m. and 5:00 p.m.

3. Inmates requesting special diets for religious beliefs will either be granted the special diet or a hearing will be held with the right of direct appeal to Sheriff Bailey Grant.

## X.

### EDUCATION

1. Within sixty (60) days from the signing of this Consent Decree, a report shall be submitted to the Court, with copies to all counsel, describing the education programs which are presently available at the facility. The report shall include all proposed changes, alterations, or initiation of educational programs, and shall describe in detail prospective programs, and shall describe in detail prospective programs, such as G.E.D. or correspondence courses, to be established within one hundred twenty days (120) after consultation with the Ouachita Parish School Board or State Board of Education.

## XI.

### EXERCISE AND RECREATION

1. Upon completion of the outdoor exercise area, all inmates, including both men and women, shall have the opportunity to take outdoor physical exercise for not less than one-hour periods to be held three times per week. When inclement weather prevents exercise on the date regularly scheduled, an alternate date shall be scheduled unless inclement weather continues for a period of several days. A plan for such exercise program shall be submitted to the Court and plaintiff's counsel within thirty (30) days from the date of this Consent Decree.

2. Within fifteen (15) days from the date of this Decree, defendants shall submit a timetable to the Court and counsel for plaintiffs for the completion of the planned recreational facility at the Ouachita Parish Jail.

3. Checkers, chess, cards and/or other games shall be made available to the inmates.

4. Inmates may continue to have televisions and small portable radios in each cell area. In the new facility, the Sheriff and Police Jury shall increase the opportunities for indoor diversion and entertainment, including providing television at Parish expense or from a prisoner welfare fund, ample day rooms, and the like.

## XIII.

### SECURITY

1. Commencing within sixty (60) days, an inmate interview will be conducted and recorded in writing of all new inmates which interview will be conducted within sixteen (16) hours from admission to the facility. The intake interview form, containing the reasons for the inmate's assignment, will be made a part of the inmate's permanent record and no inmate will be transferred except on direct orders of the jailer in charge of the shift and a written record will be maintained in case of any such transfers. In the event an inmate requests a transfer from one area of the prison facility to another area of the prison facility, a written record of that request will be made and the action taken on that request will be noted thereon. However, in no case shall any inmate be placed or left in a cell in which it is or becomes obvious that he is in danger from, or constitutes a danger to, the other inmates therein.

2. While juveniles are not normally housed in the Ouachita Parish Jail, should it become necessary to house a juvenile in the Ouachita Parish Jail, that juvenile will not be housed with adult inmates.

3. Matrons shall be provided for the supervision and protection of female inmates. It is contemplated that these matrons will also serve as LPN's under the medical plan submitted above.

4. All jail personnel involved with the handling or supervision of inmates will be required to submit to an evaluation designed to identify unsuitable characteristics which would prevent them from serving as effective jail personnel. The Sheriff will implement this program within thirty (30) days of this Consent Order.

5. In order to facilitate meeting both classification and space requirements, and particularly to alleviate overcrowding of the present facility, the Sheriff and Police Jury shall continue to cooperate with the Judges in the Fourth Judicial District for the Parish of Ouachita and the District Attorney, seeking to institute and expand release on recognizance and pretrial diversion programs.

6. Inmates' personal property will not be donated to civic or charitable institutions or to any other institution without the inmate's permission or without affording the inmate a due process hearing.

### APPROVAL BY PARTIES TO PROPOSED CONSENT ORDER

Signed this 12th day of February, 1979.

/s/ Mary Louise Strong

Mary Louise Strong

Attorney for Plaintiffs

/s/ David R. Duhon

David R. Duhon

Attorney for Plaintiffs

/s/ Ben R. Hanchey
Ben R. Hanchey
Attorney for Defendants Ouachita Parish
Police Jurors
/s/ V. Gerald Dean
V. Gerald Dean
Attorney for Defendant Bailey Grant, Sheriff
/s/ Marvin Montgomery
Marvin Montgomery
Assistant Attorney General, State of Louisiana
/s/ R. James Kellogg
R. James Kellogg
Attorney for Plaintiffs

## PRELIMINARY APPROVAL OF PARTIAL CONSENT DECREE

This action was brought by James Troy McMurry and others on behalf of all present and future inmates of the Ouachita Parish Jail to remedy alleged deficiencies in the construction and operation of the Jail. James Troy McMurry and the other named plaintiffs were certified as appropriate representatives of the class on July 17, 1978. Since that time plaintiffs, through their counsel, have diligently engaged in thorough discovery and, based on the results of that discovery, have conscientiously negotiated with the defendants. The Partial Consent Decree accompanying this Order is the fruit of the labors of both sides to reach a fair and reasonable resolution of the issues dealt with therein, and is hereby given the preliminary approval of the Court.

The Court recognizes that there are separate and distinct obligations contained in this Decree pertaining to the Sheriff of Ouachita Parish, the Ouachita Parish Police Jury, and the officials of the State of Louisiana. Recognizing this, each party by consenting to the entirety of this Decree obligates itself only as to those obligations pertaining to that party.

Further, the Court recognizes that certain of the obligations imposed by the Decree create affirmative duties which involve persons, such as physicians and dentists, who are not within the control of the party owing the duty. This Decree contemplates that the defendants will make every reasonable effort to discharge those obligations. In the event the defendants cannot discharge their obligations, the Court's continuing jurisdiction will be invoked to secure an appropriate remedy. However, as a matter of policy, the Court will not hold in contempt of court any defendant who has in good faith made every reasonable effort to comply with this Decree.

Final approval of this Decree must await proper notice and an opportunity for the individual class members to voice their objections, if any, to the terms of the Decree. Accordingly, the parties are directed jointly to prepare and to submit within ten (10) days for approval by the Court the plan for distribution of the Notice and the Decree.

THUS DONE AND SIGNED this 12th day of February, 1979 in Chambers in Monroe, Louisiana.

## APPENDIX B
## NOTICE

TO: The named plaintiffs in this lawsuit and to all members of the two sub-classes certified by this court on July 17, 1978. Said classes being:

(1) All pre-trial detainees presently and in the future held in the Ouachita Parish Jail; and

(2) All convicted prisoners presently and in the future held in the Ouachita Parish Jail.

\* \* \* \* \* \*

## NOTICE OF PROPOSED PARTIAL COMPROMISE AND SETTLEMENT

YOU ARE HEREBY NOTIFIED that a class action lawsuit pending in the United States District Court for the Western District of Louisiana, Shreveport Division, has been compromised. In this lawsuit, you, as a member of the class, have an interest. The named plaintiffs brought this action on behalf of themselves and the members of the class against the following defendants:

(1) C. PAUL PHELPS, as Secretary of the Department of Corrections for the State of Louisiana;

(2) DANIEL L. KELLY, as Fire Marshal for the State of Louisiana;

(3) DR. J. T. HAMERICK, as Director of the Louisiana State Division of Health;

(4) WILLIAM CHERRY, as Secretary of the Department of Health and Human Resources for the State of Louisiana;

(5) BAILEY GRANT, as Sheriff for the Parish of Ouachita; and

(6) ARLAN E. RAWLS, BILLY BANKS, ROBERT C. DOWNING, A. E. PIERCE, III, WILLIE CRAIN, and BILLY F. WHILHITE, as members of the Ouachita Parish Police Jury.

The lawsuit alleges that the conditions of confinement at the Ouachita Parish Jail may have denied inmates certain rights, privileges and immunities guaranteed them by the United States Constitution and various laws of the State of Louisiana. Specifically, plaintiffs alleged that conditions of confinement amount to cruel and unusual punishment, denial of First Amendment rights, a denial of access to the courts, a denial of equal protection and a denial of due process of the laws. These alleged deprivations have occurred in regard to both convicted and pretrial inmates.

Some of the issues between the plaintiffs and defendants have been submitted to the court and received preliminary approval. The terms of this partial proposed agreement which would settle some of the issues in this case, is attached. If approved by you, the terms of the attached decree will be binding on all members of the class housed in the Ouachita Parish Jail.

This suit deals only with injunctive and declaratory relief and in no way affects any monetary damages. Any claims for money must be brought in another proceeding.

Under the terms of the proposed partial settlement, the defendants have agreed to alter certain conditions of confinement existing at the Ouachita Parish Jail. This injunction will remain in effect until the parties agree, or the court is satisfied, that the terms of the partial settlement have been satisfied and that further supervision by the court is unnecessary.

You are hereby given notice as a member of the class that the proposed partial decree has been preliminarily approved. You should read the terms of this proposed decree and consider the effect it will have upon you. If you think that any of the terms of this partial decree are unfair, you have a right to file a written objection within thirty (30) days of this date. Any objection should be put in writing and mailed to Hon. Robert H. Shemwell, Clerk of the United States District Court, Western District of Louisiana, 106 Joe D. Waggonner Federal Building, 500 Fannin Street, Shreveport, Louisiana 71101. Any objection shall refer to the name and number of this case as follows: *McMurry v. Phelps*, Civil Action No. 77–1289. For your use and convenience, a form addressed to Mr. Shemwell with the appropriate reference to the suit is being supplied along with this notice. The court will consider all objections and decide whether any merit has been shown.

The proposed partial decree will not become final and binding until it has been approved by the court, after a hearing. The hearing will be held before United States Magistrate James M. Barton at the Ouachita Parish Jail at a time to be set by the Magistrate. At this hearing, you may appear and state any objection to the terms of the proposed consent decree.

THUS DONE AND SIGNED, officially, in the City of Shreveport, Parish of Caddo, State of Louisiana, on this 7th day of January, 1982.

Robert H. Shemwell 
Clerk, U. S. District Court

OBJECTION(S) TO PARTIAL COMPROMISE SETTLEMENT

TO: Robert H. Shemwell 
Clerk of Court 
United States District Court 
Western District of Louisiana 
106 Joe D. Waggonner Federal Building 
500 Fannin Street 
Shreveport, Louisiana 71101

Re: James T. McMurry, et al. 
v. C. Paul Phelps, et al. 
Civil Action No. 77–1289

I, an inmate of the Ouachita Parish Jail, object to the terms of the proposed decree because: _____